ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
**02/28/2018** at 04:47:54 PM
Clerk of the Superior Court
By Marivel Martinez-Frengel, Deputy Clerk

1  GERALD SINGLETON (SBN 208783)
   BRODY A. McBRIDE (SBN 270852)
2  TRENTON G. LAMERE (SBN 272760)
   SINGLETON LAW FIRM, APC
3  115 West Plaza Street
   Solana Beach, CA 92075
4  Tel: (760) 697-1330
   Fax: (760) 697-1329
5  Email. Gerald@SLFfirm.com
          Brody@SLFfirm.com
6         Trenton@SLFfirm.com

7  JUSTIN O. WALKER (SBN: 275633)
   LORRIE A. WALKER (SBN: 272637)
8  WALKER LAW, PC
9  600 B Street, Suite 2490
   San Diego, CA 92101
10 justin@walkerlawsd.com
   lorrie@walkerlawsd.com
11 Tel: (619) 839-9978
12 Fax: (619) 220-0667

13 Attorneys for Plaintiff PAUL HARNER, an individual

14              SUPERIOR COURT OF CALIFORNIA

15        COUNTY OF SAN DIEGO – CENTRAL – HALL OF JUSTICE

16

17 PAUL HARNER, an individual;                     Case No.: 37-2018-00010746-CU-BT-CTL

18           Plaintiff,                            **UNLIMITED CIVIL ACTION**

19 v.                                              **COMPLAINT FOR DAMAGES FOR:**

20 USAA GENERAL INDEMNITY                          1. **BREACH OF CONTRACTUAL DUTY TO PAY A COVERED CLAIM;**
   COMPANY, a Texas corporation; and DOES
21 1 through 50, inclusive,                        2. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**
22           Defendants.                           3. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; AND**
23                                                 4. **CONVERSION**
24
                                                   **DEMAND FOR JURY TRIAL**
25

26

27    Plaintiff PAUL HARNER, an individual, ("HARNER") alleges the following:

28

---

1

COMPLAINT FOR DAMAGES

## I. GENERAL ALLEGATIONS

1. The damages upon which this action is based occurred in the County of San Diego, State of California.

2. At all times relevant herein, HARNER was a resident of the County of San Diego, State of California.

3. Defendant USAA GENERAL INDEMNITY COMPANY ("USAA"), is a Texas corporation, registered in California as a foreign corporation with California Entity No.: C0762330, and has a principal place of business located at 9800 Fredericksburg Road, San Antonio, Texas 78288. USAA is and, at all times relevant herein, was, an insurance company regularly doing business in the State of California, whose business included, among other things, the adjustment of insurance claims.

4. Plaintiff is unaware of the true names and capacities of Defendants sued herein as DOES 1 through 50, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff will amend his Complaint to allege the true names and capacities and causes of action against said fictitiously named Defendants when the same have been ascertained. Plaintiff is informed and believes and thereon alleges that each of the Defendants designated herein as a "DOE" is responsible in some manner and liable herein to Plaintiff for his damages.

5. Plaintiff is further informed and believes and thereon alleges that at all times herein alleged, each of the aforesaid Defendants, including, but not limited to DOES 1 through 50, was the agent, servant, partner, aider and abettor, co-conspirator, alter ego, and/or joint venturer of the others herein and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy, alter ego, and/or joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their conduct constituted a breach of duty owed to HARNER.

6. The tortious acts and omissions alleged herein were performed by management level employees of USAA.

//
//

7. Defendants, and each of them, committed these acts alleged herein maliciously, fraudulently, and oppressively, and with the wrongful intention of injuring HARNER, and acted with an improper and evil motive amounting to malice or despicable conduct. Alternatively, Defendants' wrongful conduct was carried out with a conscious disregard for HARNER's rights.

8. Defendants' conduct warrants the assessment of punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar conduct.

9. Each of these acts and failures to act are alleged against each Defendant whether acting individually, jointly, or severally. Each of the Defendants or their alter egos agreed and conspired with the others in the commission of these acts or failures to act.

## II. SPECIFIC FACTUAL ALLEGATIONS

### A. HARNER's USAA Policy

10. USAA General Indemnity Company issued PAUL HARNER California Auto Policy number 03617 98 92G 7101 9, with a Policy Period from June 17, 2014, through December 17, 2014 ("USAA Policy").

11. The USAA Policy provided, *inter alia*, Uninsured Motorist bodily injury and property damage coverage to HARNER for a 2005 Kawasaki ZX10R Ninja motorcycle, VIN # JKAZXCC165A030219 ("Kawasaki motorcycle").

12. The USAA Policy provided Uninsured Motorist bodily injury policy limits of $500,000 per accident/per person. The USAA Policy contained the following insuring agreement provision:

> A. UNINSURED MOTORIST BODILY INJURY COVERAGE (referred to as UMBI)
>
> 1. We will pay compensatory damages which a covered person is legally entitled to recover from the owner or operator of an uninsured motor vehicle or underinsured motor vehicle because of BI sustained by a covered person and caused by an auto accident.

13. HARNER timely paid all premiums due under the USAA Policy, and complied with all terms and conditions required of an insured under the USAA Policy at all times relevant herein.

3
COMPLAINT FOR DAMAGES

**B.     The Underlying Automobile Collision**

14.     On August 20, 2014, at approximately 8:30 a.m., HARNER was driving his Kawasaki motorcycle northbound on Interstate 5 in the number one lane, through Chula Vista, approaching his office in San Diego.

15.     At all times relevant herein, HARNER's Kawasaki motorcycle was insured under the USAA Policy.

16.     HARNER was driving approximately 30 mph in the number one lane, but the traffic to his right, in the number two lane, had come to a complete stop.

17.     Suddenly, a white car swerved out from the number two lane and into the number one lane, directly in front of HARNER. Unable to stop, HARNER was launched from his bike up onto the rear of the white vehicle that had just cut him off.

18.     HARNER's head smashed into the back of the white car. HARNER immediately rolled backwards onto the trunk. The white car then braked and HARNER was thrown off the rear of the vehicle and onto the ground, where HARNER'S head was once again smacked, this time by the asphalt. The momentum then caused HARNER to roll on the ground along the freeway. The vehicle directly behind HARNER, whose driver witnessed the collision, had to swerve to avoid hitting HARNER.

19.     Despite wearing a helmet and a mesh-plated leather jacket, HARNER's elbow and arm were dripping blood down his jacket, the face mask to his helmet was shattered, and his helmet was indented at various points where HARNER's head hit the car and the pavement.

20.     HARNER stumbled to his feet and floundered towards the side of the freeway, where he, according to witness testimony, struggled to take off his leather jacket and appeared "not all there," uncertain as to what was going on.

21.     HARNER's head felt "foggy" to him. He also felt dizzy.

22.     Two bystanders who had witnessed the accident then came from the opposite side of the freeway, hopped over the median, and moved HARNER's motorcycle to the side of the freeway.

23.     The motorcycle was inoperable with a broken frame.

4
COMPLAINT FOR DAMAGES

24. The police arrived, interviewed witnesses, and prepared a report.

25. The driver of the white vehicle that had cut HARNER off admitted fault for the accident.

26. HARNER, believing he may be OK with a little time, agreed to have the tow truck driver drop HARNER off at his office.

C. **The Brain Injury**

27. A few hours after being dropped off at his office, HARNER continued to feel foggy, dizzy, and was generally unable to concentrate.

28. HARNER decided that he should go to the emergency room.

29. HARNER arrived at the emergency room; however, to this day, HARNER has no recollection as to how he got there.

30. HARNER's abrasions were addressed, and x-rays were taken.

31. A neurological exam was conducted, and HARNER's continued dizziness and foggy head were noted. HARNER was advised to see his primary care physician.

32. HARNER did not have health insurance at the time of the accident.

33. HARNER was advised that he would need to treat with a chiropractor before he could be referred to a neurologist. Therefore, he treated with a chiropractor for three months, after which point he was discharged and referred to a neurologist, Dr. Kevin Yoo.

34. Over the entire course of time HARNER treated with his chiropractor, HARNER consistently complained of headaches, irritability, and memory loss.

35. Dr. Yoo reviewed an MRI taken of HARNER and examined HARNER on two separate occasions. Based upon his examinations and the evaluation of HARNER's MRI, Dr. Yoo opined that HARNER's symptoms and complaints were consistent with a traumatic brain injury caused by injuries sustained in the August 20, 2014, collision.

36. Dr. Yoo referred HARNER to the Scripps Encinitas Brain Injury Rehabilitation Center ("Scripps Rehab").

//

//

37. On June 24, 2015, almost one year after the accident, HARNER underwent an eight-hour evaluation with an occupational therapist at Scripps Rehab. As part of this, HARNER was administered the Saint Louis University Mental Status Exam ("SLUMS").

38. HARNER's SLUMS test results evidenced that HARNER suffered impairment to his short-term memory, processing speed, working memory, and cognitive endurance.

39. HARNER's results evidenced impairment so severe that he was categorized at the same level as a patient with dementia.

40. Scripps Rehab recommended that HARNER undergo an inpatient cognitive rehabilitation program. However, HARNER, as the owner of his own business, was unable to commit to an inpatient program. Instead, HARNER agreed to a twice-a-week outpatient program.

41. Throughout his treatment with Scripps Rehab, HARNER presented with decreased processing speed and difficulty with both his short term and working memories. He also displayed divided attention and deficiencies in his executive functioning.

42. HARNER was impaired in his instrumental activities of daily living. He was unable to recall things or "get his words out" late in the day.

43. HARNER was diagnosed with mild dyspraxia of speech and word retrieval deficit caused by his memory issues.

44. The cognitive difficulties that HARNER was experiencing were overwhelming and difficult to accept. At times, HARNER would become tearful trying to cope with the mental changes he was experiencing. HARNER limited his social interactions due to mental fatigue, hypersensitivity to noise, and overstimulation.

45. Scripps Rehab explained to HARNER that, while his cognitive deficit *may* improve over time, the only available treatment was to manage his lifestyle accordingly. In other words, simply to find a way to cope with the situation and manage his deficits.

46. Additionally, HARNER's business was suffering.

//

//

47. HARNER began using an electronic calendaring system to help him from forgetting appointments and deadlines. He began scheduling appointments in the morning, as opposed to the afternoon, because his brain would tire out quickly throughout the day.

48. As the day progressed, HARNER would become forgetful and unable to handle his workload, and correspondingly agitated at his state of affairs.

49. HARNER's office manager and son were required to take over tasks and constantly remind HARNER of his upcoming obligations.

**D.    Third Party Insurance Pays Their Policy Limits to HARNER**

50. On February 2, 2016, HARNER made a policy limits demand with State Farm, as carrier for the third-party tortfeasor, i.e. the driver of the white vehicle.

51. Shortly thereafter, on February 22, 2016, State Farm agreed to pay HARNER the $100,000 policy limits available under their insured's policy.

**E.    USAA's Bad Faith Pre-Arbitration Demand**

52. On March 9, 2016, HARNER, by way of his counsel, Vanessa Pena of Pena Law, served a policy limits demand to USAA, seeking all available funds under his uninsured motorist bodily injury ("UMBI") coverage, which provided for $500,000 in coverage. Given the $100,000 received from the third-party tortfeasor, available funds under the UMBI portion of HARNER's USAA Policy totaled $400,000. Counsel for HARNER also provided USAA with medical records and billings evidencing the extent of HARNER's damages.

53. Pursuant to the Fair Claims Settlement Practice Regulations, California Code of Regulations sections 2695.1 et seq., and in particular section 2695.5, subsections (b) and (e), within fifteen (15) days, USAA had a duty to respond to HARNER, by acknowledging receipt of this correspondence and furnishing HARNER with a complete response based on the facts as then known by USAA.

54. Notwithstanding, USAA engaged in the first of what would become a litany of regulatory violations and breach of duties owed to HARNER, by delaying until March 31, 2016, to correspond with HARNER, requesting further documentation and additional time to investigate the claim.

55. As such, on March 31, 2016, HARNER provided additional financial and payroll records to USAA pursuant to its request, and reiterated his demand for policy limits.

56. On April 7, 2016, USAA claims adjuster Michelle Hutto sent correspondence to HARNER offering $75,000, which USAA stated represented "the fair value of the claims." Despite USAA's duty to do so, USAA failed to provide an explanation to HARNER regarding the factual and/or other basis for its valuation of HARNER's claim. There is no evidence that USAA properly investigated HARNER's claim, despite USAA's obligation and duty to do so.

57. The April 7, 2016, letter from USAA further stated, "this offer is based on the supporting documents received to date…" and USAA "will re-evaluate the claim should additional loss of earnings supports be presented." Therefore, as of April 7, 2016, USAA's fair value assessment of the claim equaled $75,000. Those funds were undisputed and due immediately to HARNER.

58. On April 19, 2016, HARNER sent additional documentation to USAA, including current medical records, medical billing records, HARNER's income tax records demonstrating his loss of income due to the collision, payroll records, invoices for lost accounts, and other documentation supporting HARNER's significant damages. HARNER again reiterated his demand for the full UMBI policy limits based on the overwhelming evidence of HARNER's damages.

59. On May 12, 2016, USAA adjuster Ms. Hutto communicated with HARNER's counsel via telephone, wherein Ms. Hutto stated that she believed HARNER's injuries were "subjective" and did not affect him that much. Ms. Hutto falsely, without any evidence, claimed that HARNER may have had a prior head injury leading to his cognitive deficits because HARNER played volleyball. Ms. Hutto did not provide any support or evidence for her assertions, and failed to acknowledge the numerous letters from HARNER's family and coworkers that said HARNER had cognitive issues and struggles. Ms. Hutto's baseless assertions were made despite the multiple documents provided to USAA that directly contradict USAA's valuation of the claim. Under California law, USAA engaged in bad faith by ignoring evidence

1 that supports HARNER's claim and focusing solely on those "facts" which may justify denial of
2 the claim.

3     60.    On the same day, May 12, 2016, Ms. Hutto sent correspondence to HARNER
4 offering $80,000 to HARNER as "the fair value of the claims." Again, despite USAA's duty to
5 do so, USAA failed to provide an explanation to HARNER regarding the factual and/or other
6 basis for the valuation of HARNER's claim. Additionally, pursuant to the Fair Claims Settlement
7 Practice Regulations, California Code of Regulations section 2695.7(b)(1), USAA had an
8 obligation to provide HARNER with a written statement explaining all bases and giving reasons
9 for the rejection or partial denial of his claim. By offering HARNER less than ¼ of the total
10 policy limits demanded, USAA partially denied HARNER's claim and was obligated to provide
11 an explanation as to the partial denial. USAA failed to adhere to their obligations under
12 California law.

13     61.    On May 17, 2016, pursuant to the USAA Policy, HARNER sent a Notice and
14 Demand for Arbitration to USAA via certified mail.

15     62.    On May 19, 2016, HARNER sent correspondence to USAA disputing Ms. Hutto's
16 baseless assertions that HARNER's injuries were "subjective" or that HARNER's traumatic brain
17 injury was caused by some undisclosed other reason. It was clear that after several months,
18 USAA was intentionally and deliberately delaying HARNER's claim for UMBI benefits under
19 the USAA Policy in a conscious and deliberate effort to avoid payment of HARNER's claim.

20 **F.    USAA Engages in Further Bad Faith**

21     63.    On May 31, 2016, communication was received indicating that USAA was being
22 represented by Scott Laqua, Esq. with the Law Offices of Keevil L. Markham in connection with
23 HARNER's claim. Mr. Laqua requested "all relevant information upon which to evaluate PAUL
24 HARNER's claim" including "list of healthcare providers, along with any documentation of
25 medical billings and medical payments." Mr. Laqua, as agent of and on behalf of USAA, said that
26 USAA's "primary effort is to resolve the matter as quickly and efficiently as possible." Mr.
27 Laqua, as agent of and on behalf of USAA, failed to acknowledge that voluminous
28 //

documentation and medical evidence had already been submitted to USAA in support of HARNER's claim.

64. In violation of the Fair Claims Settlement Practice Regulations, the May 31, 2016, correspondence from Mr. Laqua, as agent of and on behalf of USAA, also failed to inform HARNER as to the reasons why his claim was being partially denied by USAA. The correspondence ignored the tax returns and witness statements demonstrating HARNER's loss of income as a result of the collision. The correspondence failed to demonstrate USAA's diligent pursuit of a fair and objective investigation into HARNER's claim. Further, the correspondence failed to address the overdue, undisputed amount owed to HARNER – to wit, $80,000.

65. On June 8, 2016, HARNER, through his counsel, responded to Mr. Laqua's correspondence. HARNER agreed to – yet again – provide documentation that was already provided to USAA. HARNER reiterated his demand that the undisputed portion of the claim be paid, and further reiterated his demand that USAA conduct a fair and objective investigation of HARNER's claim and pay the fair value of the claim – USAA's policy limits. Additionally, HARNER proposed the name of three potential arbitrators for USAA's consideration. Shortly thereafter, HARNER further cooperated with USAA by providing it with a medical records authorization, signed by HARNER.

66. Despite HARNER's repeated demands – made over the course of several months – that USAA make its position clear regarding the reason(s) for its low-ball valuation of HARNER's claim, as well as the reason(s) for its partial denial of HARNER's claim, USAA continually failed to provide said clarification thereby preventing HARNER from knowing what issues USAA believed were in dispute.

67. On August 10, 2016, USAA adjuster Doug Levy sent correspondence to HARNER via his counsel stating that the undisputed amount of HARNER's claim was "the pre-litigation offer" and "no longer on the table." This is despite the fact that USAA had already unequivocally defined the undisputed amount as USAA's "fair value of the claims." USAA's correspondence failed to explain the basis for the retraction of the undisputed amount, or provide

any information whatsoever regarding USAA's valuation of HARNER's claim. This is further evidence of USAA's bad faith conduct and attempts to delay and undervalue HARNER's claim.

68. USAA delayed for more than eight (8) months to agree to an arbitrator for HARNER's claim, despite the fact that HARNER proposed approximately sixteen (16) available arbitrators. It was only after HARNER was forced to file a Petition to Compel Arbitration and Appoint an Arbitrator on January 18, 2017, that Mr. Laqua, as agent of and on behalf of USAA, agreed to arbitrate HARNER's UMBI claim before Darrell Forgey with Judicate West. Notably, Mr. Forgery was proposed by HARNER as a potential arbitrator more than three (3) months earlier. USAA's delay in selecting an arbitrator, and rejecting each and every arbitrator proposed by HARNER, forcing HARNER to seek judicial redress, is further evidence of USAA's bad faith handling of HARNER's claim.

### G. USAA's Bad Faith by Relying on Conflicting Expert Reports

69. On or about August 31, 2016, USAA engaged Philip K. Stenquist, a neuropsychologist, to conduct a neurocognitive examination of HARNER. Dr. Stenquist concluded that HARNER was "consistent with some difficulty in memory acquisition" and "does not suffer from a diagnosable psychiatric condition." Dr. Stenquist opined that HARNER's ongoing neurocognitive impairment was a result of a medical condition called "small vessel encephalopathy." Dr. Stenquist is not a medical doctor.

70. On or about February 21, 2017, USAA engaged Dr. Jonathan Schleimer, a neurologist, to conduct a neurologic independent medical evaluation of HARNER. Dr. Schleimer concluded that HARNER's ongoing neurological symptoms are a product of "underlying depression." Dr. Schleimer is not a psychiatrist or psychologist.

71. Under California law, USAA may not ignore evidence and facts in support of a claim, choosing instead to focus only on evidence that would tend to support denial of a claim. However, in bad faith, USAA ignored the voluminous medical documentation, records, and witness statements provided to it by HARNER, and chose to rely on conflicting reports of expert witnesses retained by USAA regarding alleged alternative causes of HARNER's neurocognitive symptoms.

**H.** **Arbitration Award Over Three Times USAA's Undisputed Amount**

72. On August 18, 2017, and August 21, 2017 (over fifteen (15) months after arbitration was first demanded, and over nineteen (19) months after USAA was first provided with all relevant documentation and evidence), UMBI arbitration proceeded in front of arbitrator Darrell Forgey.

73. At the conclusion of arbitration, Mr. Forgery awarded HARNER $352,979.00, with the net value of the award totaling more than three (3) times the amount of USAA's initial valuation of HARNER's claim.

## FIRST CAUSE OF ACTION

## BREACH OF CONTRACTUAL DUTY TO PAY A COVERED CLAIM

74. Plaintiff repeats and re-alleges each and every foregoing and subsequent allegation in this Complaint as though fully set forth herein, and further alleges as follows.

75. HARNER and USAA entered into a contract (to wit, an automobile insurance policy) whereby USAA would provide insurance coverage to HARNER including, but not limited to, uninsured and underinsured motorist coverage, policy number 03617 98 92G 7101 9.

76. HARNER suffered a loss that was covered under the policy.

77. HARNER properly presented a claim to USAA to be compensated for his claimed loss.

78. HARNER did all, or substantially all, of the significant things that the contract required him to do including, but not limited to, dutifully paying his premiums.

79. USAA was timely notified of HARNER's loss.

80. All of the conditions required by the contract for USAA's performance occurred.

81. Notwithstanding, USAA breached the contract.

82. USAA failed to pay the full amount of the covered loss.

83. As a direct and proximate result of USAA's breaches, HARNER suffered harm in an amount to be proven at trial.

84. USAA's breach of contract was a substantial factor in causing HARNER's harm.

//

## SECOND CAUSE OF ACTION

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

85. Plaintiff repeats and re-alleges each and every foregoing and subsequent allegation in this Complaint as though fully set forth herein, and further alleges as follows.

86. In every insurance policy, there is an implied obligation of good faith and fair dealing that the insurance company will not do anything to injure the right of its insured to receive the benefits of the agreement.

87. To fulfill this implied obligation of good faith and fair dealing, USAA must give at least as much consideration to the interests of the insured as it gives to its own interests.

88. Notwithstanding, USAA breached the implied obligation of good faith and fair dealing by unreasonably acting and/or failing to act, without proper cause, in a manner that has deprived HARNER of the benefits of the policy, including, but not limited to, the following:

   a. By delaying payment of benefits due to HARNER under his insurance policy with USAA;

   b. By failing to pay HARNER for a loss covered under his insurance policy;

   c. Failing to comply with the requirements of the Fair Claims Settlement Practice Regulations, California Code of Regulations section 2695.7(b)(1), *et seq.*, by, *inter alia*, failing to pay the undisputed amount of HARNER's claim;

   d. Failing to inform HARNER, in writing, of the reasons why HARNER's claim was being denied, in whole or in part;

   e. Failing to timely furnish HARNER with a complete response to his claim based on the facts as then known by USAA;

   f. Failing to properly conduct and diligently pursue a full, fair, prompt, objective, and/or thorough investigation into HARNER's claim by, *inter alia,* failing to diligently search for and consider evidence that supported coverage for HARNER's claimed loss, failing to timely obtain medical records, failing to timely and thoroughly review documentation submitted to

13
COMPLAINT FOR DAMAGES

USAA by HARNER in support of his claim, failing to timely conduct witness interviews, and failing to consult with experienced medical professionals in an effort to properly valuate HARNER's claim; and

g. Attempting to settle HARNER's claim by making a settlement offer that was unreasonably low, to wit, USAA's offers of $75,000 and $80,000.

89. As a direct and proximate result of USAA's actions and inactions, HARNER suffered harm in an amount to be proven at trial.

90. USAA's actions and inactions were, each independently and/or collectively, substantial factors in causing HARNER's harm.

## THIRD CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

91. Plaintiff repeats and re-alleges each and every foregoing and subsequent allegation in this Complaint as though fully set forth herein, and further alleges as follows.

92. USAA's conduct was outrageous.

93. USAA intended to cause HARNER emotional distress or, in the alternative, USAA acted with reckless disregard of the probability that HARNER would suffer emotional distress, knowing that HARNER was present when the conduct occurred.

94. HARNER suffered severe emotional distress.

95. USAA's conduct was a substantial factor in causing HARNER's severe emotional distress.

## FOURTH CAUSE OF ACTION

## CONVERSION

96. Plaintiff repeats and re-alleges each and every foregoing and subsequent allegation in this Complaint as though fully set forth herein, and further allege as follows.

97. Pursuant to the Fair Claims Settlement Practice Regulations, California Code of Regulations section 2695.7(h), HARNER owned and/or had a right to possess the undisputed amount of his claim, which was $75,000 as of April 7, 2016, and $80,000 as of May 12, 2016.

//

14
COMPLAINT FOR DAMAGES

98. Notwithstanding, USAA intentionally and substantially interfered with HARNER's property by refusing to provide this money to HARNER.

99. USAA maliciously and oppressively converted HARNER's funds in an effort to, *inter alia*, extort a release from HARNER of HARNER's rights to be paid the full value of his claim.

100. HARNER did not consent to USAA's conversion of his money.

101. HARNER was harmed.

102. USAA's conduct was a substantial factor in causing HARNER's harm.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. For compensatory damages in an amount according to proof;
2. For general damages in an amount according to proof;
3. For special damages in an amount according to proof;
4. For mental and emotional distress damages;
5. For punitive damages in an amount necessary to make an example of and to punish USAA, and to deter future similar misconduct;
6. For attorney's fees as provided for by law;
7. For costs of suit;
8. For an award of interest, including prejudgment interest, at the legal rate as permitted by law;
9. For such other and further relief as the Court deems proper and just under all the circumstances.

//
//
//
//
//
//

1 | **DEMAND FOR JURY TRIAL**

2 | Plaintiff PAUL HARNER hereby requests trial by jury for all causes of action and forms

3 | of relief requested.

4 | **SINGLETON LAW FIRM, APC**

6 | Dated: February 28, 2018    By: *Gerald Singleton*
    **GERALD SINGLETON**
7 |    BRODY A. McBRIDE
    TRENTON G. LAMERE
8 |    Attorneys for Plaintiff, PAUL HARNER

10 | **WALKER LAW, PC**

13 | Dated: February 28, 2018    By: *[signature]*
    **JUSTIN O. WALKER**
14 |    LORRIE A. WALKER
    Attorneys for PAUL HARNER

---
16
COMPLAINT FOR DAMAGES