UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL HARNER,<br><br>                              Plaintiff,<br><br>v.<br><br>USAA GENERAL INDEMNITY COMPANY,<br><br>                              Defendant. | Case No.:  18-CV-1993 W (MDD)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT [DOC. 14]** |

Pending before the Court is Defendant USAA General Indemnity Co's motion for summary judgment or, in the alternative, partial summary judgment.  Plaintiff Paul Harner opposes.

The Court decides the motion on the papers submitted, and without oral argument.  See Civ.L.R. 7.1.d.1.  For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion [Doc. 14].

I.     F<span>ACTUAL</span> B<span>ACKGROUND</span>

Plaintiff Paul Harner is suing his insurer, Defendant USAA General Indemnity Company, for breach of contract, breach of the implied covenant of good faith and fair

1

dealing (i.e., "bad faith"), and intentional infliction of emotional distress. (*See Compl.*[1]) The lawsuit arises out of Harner's claim under the underinsured motorist provision in his USAA automobile policy following a motorcycle accident in which he allegedly sustained serious injuries and other damages.

### A. The accident and Harner's medical treatment.

On August 20, 2014, Harner was riding his motorcycle northbound on Interstate 5 in San Diego when a vehicle driven by Daniel Galindo swerved into his lane. (*Harner Decl.* [Doc. 20-1] ¶ 2.) Harner collided into the back of the vehicle and was thrown from his motorcycle. (*Id.*) He landed on the back of the vehicle, smashing his head on the trunk and then falling to the pavement where he again hit his head. (*Pl's Ex. 4* [Doc. 20-2] at 293.[2]) At the scene, Harner complained of dizziness and had to sit on the side of the road. (*Id.*) He also had abrasions to his right knee, elbow and hip. (*Id.*)

Harner was driven from the scene of the accident to work. (*Pl's Ex. 4* at 293.) When he arrived at work, Harner could not focus and felt "foggy" so he immediately went to the hospital emergency room for treatment. (*Id.*) He was examined, prescribed pain medication and released. (*Id.*)

On October 1, 2014, Harner was examined by Dr. Carrie Roeder at Roeder Chiropractic, Inc. (*Pl's Ex. 7* [Doc. 20-2] at 332.) Harner complained of low back pain, neck and upper back pain, as well as memory loss and difficulty concentrating. (*Id.*) Dr. Roeder treated Harner until November 14, then referred him to a neurologist, Dr. Kevin Yoo, because of continued complaints of memory loss and difficulty concentrating. (*Id.*)

---

[1] The Complaint is attached to the Notice of Removal [Doc. 1] as Exhibit 1 [Doc. 1-2]. The Complaint also includes a conversion cause of action. However, Harner concedes that the cause of action was dismissed before USAA removed the case to this Court. (*Opp'n* [Doc. 20] 22:11–14.)

[2] Plaintiff's exhibits 4 through 31 are attached to Vanessa Pena's declaration. (*See Pena Decl.* [Doc. 20-2] ¶¶ 4–21, 24, 26, 28, 35–40, 43.) Generally, page references are to the number at the end of the bates stamp. Therefore, reference to "293" means "HARNER_CF_293."

Beginning in December 2014, Harner was seen by Dr. Yoo at SD Neurosurgery. (*Pl's Ex. 8* [Doc. 20-2] at 347.) An MRI of Harner's brain suggested he suffered a traumatic brain injury ("TBI"). (*Id.* at 345.) Dr. Yoo referred Harner to Scripps Encinitas Rehabilitation Center ("Scripps") for treatment. (*Id.*)

In approximately July 2016, Harner began outpatient treatment at Scripps. (*See Pl's Ex. 9* [Doc. 20-2].) On February 29, 2016, Harner had a follow-up visit with Dr. Yoo, who reiterated his belief that Harner suffered a TBI. (*Pl's Ex. 8* at 351.) Dr. Yoo also indicated that although Harner continued to complain of memory issues, he made slow improvement and "has been able to modify his life to be able to continue running his business." (*Id.* at 351–52.) Dr. Yoo also stated that Harner "will more likely than not continue to have memory issues which he may suffer for the rest of his life given the fact that he continues to deal with these issues a year and a half after his accident." (*Id.*)

### B.    Harner's UIM claim.

The Traffic Collision Report found Daniel Galindo, the driver of the automobile, at-fault for the accident. (*Pl's Ex. 5* [Doc. 20-2] at 218.) On February 2, 2016, Harner's attorney, Vanessa Pena, made a policy limits demand to Galindo's insurance carrier, State Farm. (*Pena Decl.* ¶ 3.) On February 22, 2016, State Farm tendered the full policy limits of $100,000. (*Id.*)

On March 9, 2016, Pena made a written policy limits demand to Harner's insurer, USAA, under the underinsured motorist ("UIM") provision in his policy. (*Pena Decl.* [Doc. 20-2] ¶ 4, *Ex. 4*.) Pena detailed the collision, Harner's claimed injuries and damages, and included supporting medical and billing records. (*See Pl's Exs. 4–12* [Docs. 20-2, 20-3].) She stated that 4 months after first seeing Dr. Yoo, Harner continued to complain that "memory loss was still a traumatic issue in his life, he was having trouble running his business and maintaining his day to day rituals. Mr. Harner was severely depressed, felt lost, had terrible headaches and had trouble dealing with life." (*Ex. 4* at 294.) Harner's subsequent evaluation at Scripps found he "had a decreased

processing speed, impaired short term and working memories, impaired executive functioning and impaired divided attention," among other cognitive impairments. (*Id.*) Although Scripps recommended Harner be admitted for inpatient therapy due to the severity of his issues, Harner opted for outpatient therapy because of his financial constraints. (*Id.*) Pena also stated Harner underwent a speech pathology evaluation, which found he had problems "getting his words out, especially late in the day' [and] the overall evaluation impression indicated 'moderate attention, memory, reasoning, and reading comprehension deficits with reduced speed processing skills and Acalculia." (*Id.*) Finally, Pena provided USAA with financial and payroll records showing the effect of Harner's cognitive injury on his business and income. (*Id.*)

On March 31, 2016, Pena had a telephone conversation with Michelle Hutto, the USAA adjuster handling the claim. (*Pena Decl.* ¶ 13.) During the call, Hutto stated that Harner's claim was not worth the policy limits and requested additional records from the speech rehabilitation clinic. (*Id.*) The same day, Pena sent a letter to USAA with additional information regarding Harner's treatment and care. (*Pl's Ex. 13* [Doc. 20-3].) The information included dates Harner was seen at the clinic, and information related to his cognitive defects. (*Id.* at 468–70.)

On April 7, Hutto sent Pena a letter confirming a $75,000 settlement offer based on "the supporting documents received to date." (*Pl's Ex. 14* [Doc. 20-3] at 500.) Hutto also stated she would "re-evaluate the claim should additional loss of earnings supports be presented" and "any additional medical treatment supports and prior records should you present such evidence." (*Id.*)

On April 19, Pena sent Hutto a letter enclosing additional records. (*Pl's Ex. 15* [Doc. 20-3] at 563.) There were no documents responsive to USAA's request for medical records dating back five years before the accident because, according to Pena, Harner was "unaware/unable to recall seeing a physician in the five years prior to the accident. * * * Up to the date of the accident, Mr. Harner has been and was in perfect health." (*Id.*) She asserted USAA's settlement offer undervalued Harner's claim because

he was "experiencing severe memory loss, severe headaches, depression, mood swings, and an inability to run his business and function in social settings." (*Id.*)  Pena stated Dr. Yoo opined that Harner's injury was "a permanent brain injury and he will suffer from the memory loss for the rest of his life." (*Id.* at 564.)  She further asserted that as a result of his injury, Harner suffered a substantial loss of income, lost new accounts because he "either forgot to follow up with documents requested, forgot meetings, showed up to meetings on [the] wrong day, could not properly explain himself in meetings, etc." (*Id.*)  Finally, Pena contended Harner's personal life was greatly affected and he would most likely have ongoing medical expenses related to the accident. (*Id.* at 565.)

On May 12, 2016, Hutto sent Pena a letter offering $80,000 in settlement of the claim. (*Pl's Ex. 21* [Doc. 20-4] at 627.)  The letter explained the offer was based on USAA's conclusion that Harner's damages consisted of $14,059 in medical expenses, $3,038 for the cost of hiring an assistant, and $162,903 in general damages (minus the $100,000 already paid by State Farm). (*Id.*)  The same day, Pena spoke with Hutto regarding USAA's valuation of the claim. (*Pena Decl.* ¶ 23.)  Hutto stated USAA's offer was based on its belief that (1) Harner's symptoms may have been caused by a prior head injury from playing volleyball; (2) his symptoms were subjective in nature; (3) he was coping well with his injuries; and (4) he had no wage loss or future lost income. (*Id.*)

What Hutto did not disclose to Pena was that she had discovered Facbook pictures of Harner playing volleyball that led USAA to doubt Harner's claimed head injury.  According to USAA's litigation manager, Douglas Levy, they believed the "Facebook photos . . . and Mr. Harner's activities and demeanor . . . did not appear consistent to me, in my experience, with someone alleging that they've sustained a [TBI]." (*Pl's Ex. 33* [Doc. 20-5] 34:9–13.[3])  He also testified the pictures were "so unusual in my experience that that alone warranted just some more questions that might need to be resolved." (*Id.*

---

[3] Plaintiff's Exhibit 33 is portions of Douglas Levy's deposition transcript.  Page references to the transcript are to the actual deposition page and line numbers.

5

34:21–23.)  However, USAA never asked Harner about the Facebook pictures, which were actually taken *approximately two years before the accident*.  (*Harner Decl.* ¶¶ 4–7.)  Additionally, although Levy believed USAA did not have sufficient information to "complete the evaluation" and would need an independent medical exam ("IME") of Harner (*Pl's Ex. 33* at 31:23–32:16), Levy stated USAA would not do an IME until "it looks like it's heading to litigation." (*Id.* at 35:8–19.)

On May 19, Pena wrote Hutto a letter confirming their May 12 discussion.  (*Id.* ¶ 24, *Pl's Ex. 22* [Doc. 20-4] at 630.[4])  She asserted USAA had been "provided multiple documents over the past few months which contradict all your . . . claims as to why you are denying Mr. Harner's request for the policy limits" and listed "all documents and evidence provided which dispute" USAA's claim. (*Pl's Ex. 22* at 630.)

On May 17, 2016, Pena sent USAA a Notice and Demand for Arbitration.  (*Pena Decl.* ¶ 26; *Pl's Ex. 23* [Doc. 20-4]; *Levy Decl.* [Doc. 14-2] ¶ 14.)  On June 8, 2016, Pena sent USAA's counsel, Scott Laqua, a letter proposing three potential arbitrators.  (*Pena Decl.* ¶ 28.)  Laqua did not respond.  (*Id.*)  On August 1, 2016, Pena proposed another arbitrator.  (*Id.* ¶ 30.)  Approximately two weeks later, she sent an email to Laqua following up on her past requests and adding two additional potential arbitrators.  (*Id.* ¶ 32.)  Laqua rejected all of the proposed arbitrators.  (*Id.*)

In September, Pena proposed three additional arbitrators, but Laqua either did not respond or rejected the proposal without providing a reason.  (*Pena Decl.* ¶¶ 23, 33.)  On November 9, Pena's co-counsel proposed three additional arbitrators, including Darrell Fogery.  (*Pena Decl.* ¶ 34.)  Laqua rejected all of them.  (*Id.*)

On January 4, 2017, Pena sent Laqua a letter requesting that USAA provide the "basis for your denial of full policy limits and describe the evaluation done of Mr. Harner's claim" because "[t]o date, my client has never been informed of the reason for

---

[4] The heading on the letter is dated April 19, 2019, but it references "our discussion on May 12, 2019." (*Pl's Ex. 22* p. 1.)

your denial or USAA's position regarding his injury." (*Pena Decl.* ¶ 35; *Pl's Ex. 25* [Doc. 20-4] at 02471.)  The letter also listed the 13 arbitrators Harner's attorneys had proposed over the past seven months, and stated that "if USAA will not agree to one of the above listed arbitrators that is available within the next 60 days, we will be forced to compel arbitration and have the court pick an arbitrator." (*Id.* at 02471–02472.)

On January 23, 2017, Pena filed a Petition to Appoint an Arbitrator and Set an Arbitration Date. (*Pena Decl.* ¶ 36; *Pl's Ex. 26* [Doc. 20-4].)  Three days later, Laqua sent Pena a letter proposing Darrell Fogery, who Pena's co-counsel had proposed to Laqua in early November. (*Pl's Ex. 27* [Doc. 20-4] at 02460.)

The arbitration took place on August 18 and 21, 2017, in front of Darrell Fogery. (*Pena Decl.* ¶ 42.)  At the arbitration, Harner claimed injuries in excess of $6,000,000, which were based on his contention that he suffered a TBI. (*Levy Decl.* ¶ 12.)  USAA disputed that Harner suffered a TBI and argued his damages were fully compensated by State Farm's tender of its policy limits. (*Id.*)

On September 12, 2017, Arbitrator Fogery found Harner had not satisfied his burden of establishing he sustained a TBI because the parties' competing "evidence is so evenly matched that claimant has not met his burden . . . ." (*Levy Decl.* ¶ 22.) Nevertheless, the Arbitrator awarded Harner UIM benefits of $352,979, consisting of: $17,979 in medical expenses; $25,000 in future medical expenses; $60,000 for loss of earnings; and $250,000 in general damages for past and future pain and suffering. (*Id.* ¶ 23.)  Deducted from the award was the $100,000 previously received from State Farm and $3,103 in medical payments. (*Id.*)  The net award, therefore, was $249,876. (*Id.*)

On September 30, 2017, USAA paid the arbitration award. (*Levy Decl.* ¶ 24.)  On November 13, 2017, the Arbitrator also awarded Harner his costs in the amount of $8,008.30, which USAA paid the same day. (*Id.* ¶ 25.)

On February 28, 2018, Harner filed the Complaint against USAA in the San Diego Superior Court alleging, among other things, bad faith with respect to USAA's investigation of Harner's claim and handling his arbitration demand. (*See Compl.*)  On

August 27, 2018, USAA removed the case to this Court. USAA now seeks summary judgment or, in the alternative, partial summary judgment.

## II. APPLICABLE LAW

### A. Summary-judgment standard

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence negating an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which the party will bear the burden of proof at trial. Id. at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159–60 (1970).

If the moving party meets this initial burden, the nonmoving party cannot avoid summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." In re Citric Acid Litig., 191 F.3d 1090, 1094 (9th Cir. 1999) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995) (citing Anderson, 477

U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Ford Motor Credit Co. v. Daugherty, 279 Fed. Appx. 500, 501 (9th Cir. 2008) (citing Celotex, 477 U.S. at 324). Additionally, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. See Matsushita, 475 U.S. at 587.

### B. California insurance law

The law implies in every contract, including insurance policies, a covenant of good faith and fair dealing. Wilson v. 21st Century Ins. Co., 42 Cal. 4th 713 (2007). "To fulfill its implied obligation, an insurer must give at least as much consideration to the interests of the insured as it gives to its own interests . . . when the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort." Frommoethelydo v. Fire Ins. Exchange, 42 Cal. 3d 208, 214–215 (1986). "The covenant [of good faith] is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement." Brehm v. 21st Century Ins. Co., 166 Cal. App. 4th 1225, 1235 (2008) (quoting Waller v. Truck Ins. Exchange, Inc. 11 Cal. 4th 1, 36 (1995)). A "'breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself,' . . . '[b]ad faith implies unfair dealing rather than mistaken judgment." Chateau Chamberay Homeowners Ass'n v. Associated Intern. Ins. Co., 90 Cal. App. 4th 335, 345 (2001) (quoting Congleton v. National Union Fire Ins. Co., 189 Cal. App. 3d 51, 59 (1987)).

"An insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might

be liable for breach of contract." Wilson, 42 Cal. 4th at 1088-89 (quoting Chateau Chamberay Homeowners Assn., 90 Cal. App. 4th at 347). However, the "genuine dispute" rule does not absolve an insurer of the obligation to fairly investigate, process, and evaluate an insured party's claim – a genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. Chateau Chamberay Homeowners Assn., 90 Cal. App. 4th at 348–349. The reasonableness of the insurer's decisions and actions is evaluated based on the time that they were made, and not based on subsequent events which may provide more evidence of insurer error. Id. at 347 (quoting Filippo Industries, Inc., v. Sun Ins. Co., 74 Cal. App. 4th 1429, 1441 (1999)). "The genuine issue rule in the context of bad faith claims allows a . . . court to grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable." Wilson, 42 Cal. 4th at 724 (quoting Amadeo v. Principal Mut. Life Ins. Co., 290 F.3d 1152, 1161-62 (9th Cir. 2002)).

### III.  DISCUSSION

#### A.  Breach of contract

USAA contends Harner's breach of contract cause of action fails as a matter of law because it paid Harner all benefits owed under the policy. (*P&A* [Doc. 14-1] 10:25–11:8.) In response, Harner appears to be contending USAA breached the policy by treating "his claims as a 'negotiation' it could 'settle' for the lowest possible amount," as opposed to paying him the "fair value of the claim" as determined by USAA. (*Opp'n* [Doc. 20] 10:27–11:5, 12:7–10.)

Under California law, a breach of contract claim requires (1) the existence of a contract, (2) plaintiff's performance of his/her contractual duties, (3) defendant's breach, and (4) plaintiff's damages resulting from the breach. Gentry v. State Farm Mut. Auto. Ins. Co., 726 F. Supp. 2d 1160, 1171 (E.D. Cal. 2010). If an insurance company pays the full amount of an arbitration award or the UIM policy limit, "it cannot be liable for breach of contract." Holenda v. Infinity Select Ins. Co., 2014 WL 559381, at *3 (C.D.

Cal., Feb. 13, 2014) (citing Paulson v. State Farm Mut. Auto. Ins. Co., 867 F. Supp. 911, 917–918 (C.D. Cal. 1994) (holding plaintiff's breach of contract claim was not viable since the insurer paid the policy's underinsured motorist limits). Accordingly, because USAA paid the entire arbitration award, generally it cannot be held liable for breaching the Policy.

Harner contends, however, that USAA's negotiation and in particular its failure to pay him $80,000 upon demand breached the UIM Insuring Agreement, which provides:

> 1. We will pay compensatory damages which a covered person is legally entitled to recover from the owner or operator of an uninsured motor vehicle or underinsured motor vehicle because of BI sustained by a covered person an caused by an auto accident.

(*Levy Decl.* [Doc. 14-2] ¶ 9, *Levy Ex. 1* [Doc. 14-2] at 4 of 9.) While this language clearly obligated USAA to pay Harner "compensatory damages" he was "legally entitled to recover," it did not prohibit USAA from negotiating his UIM claim given the parties' disagreement about his damages. Rather, as USAA points out, Insurance Code § 11580 and the policy specifically contemplate that where the parties disagree on the amount an insured is entitled to recover, the parties may resolve the issue through agreement (i.e., negotiation) or arbitration.

Moreover, USAA's correspondence to Pena specifically stated the $75,000 and $80,000 offered to Harner were "in settlement of" his UIM claim. (*Pl's Ex. 14* at 500; *Pl's Ex. 21* at 627.) The nature of the correspondence between Pena and USAA also establishes the parties disagreed regarding the amount of compensatory damages Harner was entitled to recover. (*See id.*, *Pl's Ex. 15*, *Pl's Ex. 22*.)

For these reasons, the Court finds USAA did not breach the UIM Insuring Agreement.[5] (*Levy Ex. 1* at 5 of 9.)

---

[5] Harner also appears to argue USAA breached the contract by delaying the arbitration. (*Opp'n* [Doc. 20] 11:5–8.) Because Harner fails to identify any policy provision supporting this theory, the Court finds this claim also lacks merit.

### B. Bad faith

USAA contends Harner's bad-faith cause of action fails for six reasons: (1) USAA acted reasonably in handling Harner's claim; (2) there was a genuine dispute regarding Harner's injuries (*id.* 14:3–16:2); (3) USAA relied on the advice of counsel (*id.* 16:3–23); (4) USAA reasonably relied on medical experts (*id.* 16:24–17:28); (5) Harner did not sustain economic injury (*id.* 18:1–24) and (6) Harner was not entitled to advance payment of USAA's settlement offer (*id.* 18:25–20:3). For the reasons that follow, the Court finds each argument lacks merit.

#### 1. A jury could find USAA engaged in bad faith in handling Harner's claim.

USAA contends the undisputed facts establish it acted reasonably in handling Harner's UIM claim. (*P&A* [Doc. 14-1] 11:20–14:2.) The Court disagrees.

Generally, there are two separate requirements to establish breach of the implied covenant of good faith and fair dealing: "(1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause." Love v. Fire Ins. Exchange, 221 Cal. App. 3d, 1136, 1151 (1990). Delayed payments because of "'inadequate or tardy investigations' and 'oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable' may also breach the implied covenant." Gentry v. State Farm Mut. Auto Ins., 726 F. Supp. 2d at 1166. But a withholding is considered reasonable if "the insurer conducted a 'thorough and fair' investigation, after which there remained a 'genuine dispute' as to coverage liability." Id. at 1166 (*quoting* Wilson, 42 Cal. 4th at, 720). Accordingly, the issue is whether the undisputed facts establish as a matter of law, that USAA conducted a thorough and fair investigation.

12

USAA argues its settlement offers to Harner were reasonable because it justifiably relied on medical experts and the Facebook pictures. (*P&A* [Doc. 14-1] 12:8–13.) But USAA's settlement offers were made in April and May of 2016. (*Pl's Exs. 14, 21*.) There is no indication in USAA's motion that it had consulted with the medical experts before Hutto made those settlement offers. Moreover, in his deposition, Douglas Levy, was asked whether USAA consulted with "any medical doctor or . . . professional in the healthcare industry to help USAA make sense of the documents that were supplied to them?" (*Pl's Ex. 33* at 35:8–11.) Levy admitted they did not, and explained it was because "[t]hat's usually something that comes in with litigation . . . ." (*Id.* at 35:12–15.) From this testimony, it is reasonable to infer that USAA did not obtain its medical experts' opinions until after Harner demanded arbitration. Thus, USAA's assertion that it relied on medical experts in investigating and negotiating Harner's claim lacks merit.

Levy's deposition testimony also appears to confirm its settlement offers were primarily based on the Facebook pictures of Harner playing volleyball. (*Pl's Ex. 33* at 34:9–23, 58:13–24.) According to his deposition testimony, the pictures were sufficient to believe Harner did not suffer a TBI because in Levy's "experience . . . I've never seen such an active lifestyle being portrayed by the alleged victim of a [TBI]." (*Id.*)

The problem with USAA's reliance on the pictures is that they were taken approximately two years *before* the accident. (*Harner Decl.* ¶¶ 4–6.) Thus, the pictures did not show Harner's "lifestyle" after the accident. Compounding USAA's reliance on the outdated pictures was USAA's failure to discover the issue by simply asking Pena or Harner about the Facebook posts/pictures. (*Id.* ¶ 7.)

Another problem with USAA's investigation is that Levy conceded that a "complete evaluation" of Harner's UIM claim required an IME. (*Pl's Ex. 33* at 31:23–32:16.) Yet, he also admitted that USAA would only conduct an IME if it appeared they were headed to litigation. (*Id.* at 35:8–19.) Based on this testimony, a jury could find USAA did not conduct a full and fair investigation of Harner. In fact, a jury could also

find USAA did not intend to conduct such an investigation unless Harner demanded arbitration.

USAA next disputes that it acted unreasonably in the selection of an arbitrator. (*P&A* [Doc. 14-1] 12:14–22.) USAA's argument is not persuasive.

The evidence establishes USAA delayed in agreeing to an arbitrator for eight months, and only agreed after Harner filed the petition to compel arbitration. Compounding USAA's unexplained delay was that the arbitrator USAA finally agreed to had been proposed nearly three months earlier by Harner's counsel.

A jury could find USAA's delay in agreeing to an arbitrator particularly troubling given that before Harner demanded arbitration, USAA was well aware he was suffering significant economic distress because of the accident. In fact, USAA knew Harner had to forgo the recommended inpatient treatment at Scripps because of his financial constraints. Levy's deposition testimony also suggests USAA believed Harner was lying about his head injuries based on its review of the (outdated) Facebook pictures. In short, a jury could find that notwithstanding the substantial amount of supporting documentation Pena provided to USAA, it intentionally delayed agreeing to arbitration because based on the (outdated) Facebook pictures, USAA felt Harner was lying about his head injury.

USAA next attempts to shield its delay in agreeing to arbitration by claiming communications between Harner's attorney and USAA's attorney regarding the selection of an arbitrator are protected by California's litigation privilege found in Civil Code § 47(b). (*P&A* [Doc. 14-1] 12:23–13:2.) USAA's argument lacks merit because Harner is simply using USAA's unexplained refusal to agree to an arbitrator for eight months as further evidence of USAA's bad-faith handling of Harner's UIM claim. See White v. Western Title Ins. Co., 40 Cal. 3d 870 (rejecting insurance company's argument that settlement offers made during litigation were protected by section 47(b)); see also Harman v. Golden Eagle Insurance, 2018 WL 1791915 (S.D. Cal. 2018) ("relatively recent case law . . . has carved out an exception to the litigation privilege when an insured

is attempting to introduce evidence of the insurer's litigation conduct in bad faith insurance cases"); Fidelity Nat. Financial, Inc. v. National Union Fire Ins. Co. of Pittsburg, PA, 2014 WL 1286392, at *6 (S.D. Cal. 2014) (rejecting insurance company's argument that testimony regarding its "conducting defending this action" violated the litigation privilege).

For these reasons, the Court finds a reasonable jury could find USAA engaged in bad faith.

### 2. The genuine dispute doctrine and advice of counsel defense do not save USAA from failing to conduct a fair and thorough investigation.

USAA next contends Harner cannot prevail on his bad-faith claim because there was a genuine dispute regarding the value and causation of Harner's claimed injuries. (*P&A* [Doc. 14-1] 14:5–9.)

In Wilson v. 21st Century Ins. Co., 42 Cal.4th 713 (2001), the California Supreme Court explained that the genuine dispute doctrine "does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the claim. A *genuine* dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds." Id. at 723 (emphasis in original). As explained above, a reasonable jury could find USAA failed to conduct a thorough and fair investigation. Additionally, there is no dispute USAA's settlement offers to Harner were not based on the advice of medical experts or its attorneys. For these reasons, USAA's reliance on the genuine dispute doctrine and advice of counsel is unavailing.

### 3. The evidence does not support USAA's claimed reliance on medical experts.

USAA contends Harner cannot prevail on his bad-faith claim because USAA relied on its medical experts, "who conducted two separate independent medical examinations." (*P&A* [Doc. 14-1] 16:26–27.) As discussed above, it is undisputed that USAA did not

retain its medical experts until after it offered to settle Harner's UIM claim for $75,000 and then $80,000. Accordingly, this argument lacks merit.

### 4. Disputed issues of fact exist regarding whether Harner suffered economic loss.

USAA argues Harner has not suffered any economic loss. (*P&A* 18:15–21.) In his opposition, Harner disputes USAA's argument and contends that his attorney's fees increased as a result of USAA's bad faith handling of his claim. In support of this contention, Harner points to his contingency-fee agreement with Pena. Under the agreement, Harner's fees increased from 33 1/3% to 40% of his recovery by having to arbitrate his UIM claim. (*Pena Decl.* ¶ 43; *Pl's Ex. 31* [Doc. 20-4] at 02407.)

In its moving papers, USAA anticipated Harner's argument that he sustained economic loss as a result of having to demand arbitration. (*See P&A* 18:15–21.) USAA contends that his "increased contingency fee was a result of the manner in which Harner presented the claim and demanded Arbitration—not in how USAA GIC handled it." (*Id.*)

As discussed above, the evidence could support a jury's finding that USAA's settlement offers were not based on a fair or thorough investigation, and thus constituted bad faith. These same facts could support a jury's finding that USAA's bad faith claims handling not only caused but required Harner to demand arbitration. Accordingly, a disputed issue of fact exists regarding whether Harner's economic damages—i.e., increased attorney's fees—were caused by USAA's bad faith conduct.

### C. Intentional Infliction of Emotional Distress & Punitive Damages.

USAA contends Harner cannot prevail on his cause of action for intentional infliction of emotional distress because under California law, "an insurer's mishandling of an insurance claim does not amount to 'extreme and outrageous' conduct as a matter of law." (*P&A* 20:24–26, citing Isaacson v. California Ins. Guarantee Ass'n, 44 Cal. 3d 775, 788-89 (1988).)

16

Reading all inferences in favor of Harner as the non-moving party, the Court finds a jury could find USAA did not simply mishandle his UIM claim. Rather, as discussed above, a jury could conclude: (1) USAA failed to conduct a thorough and fair investigation by ignoring the documents provided by Pena and instead relying on outdated Facebook pictures; and (2) then seeking to take advantage of Harner's claimed economic distress by (a) offering settlement amounts that were significantly less than he ultimately obtained at arbitration, and (b) delaying arbitration. See Little v. Stuyvesant Life Ins. Co., 67 Cal.App.3d 451, 462 (1977) (outrageous conduct supported by inferences that insurer ignored insured's medical information and pursued predetermined course of discontinuing disability benefit payments due under the policy).

Because disputed issues of fact exist regarding whether USAA engaged in outrageous conduct, USAA's motion for summary adjudication as to IIED cause of action and punitive damage claim is not warranted.

## IV. CONCLUSION & ORDER

For the reasons set forth above, the Court **GRANTS IN PART** and **DENIES IN PART** USAA's motion for summary judgment [Doc. 14] and **ORDERS** as follows.

- Summary adjudication is granted as to Harner's breach of contract claim.
- Summary adjudication is denied as to Harner's causes of action for bad faith and intentional infliction of emotional distress, and his punitive damage claim.

**IT IS SO ORDERED.**

Dated: October 27, 2020

_____
Hon. Thomas J. Whelan
United States District Judge