JUSTIN O. WALKER (SBN 275633)
LORRIE A. WALKER (SBN 272637)
**WALKER LAW, PC**
2247 San Diego Ave., Suite 136
San Diego, CA 92110
*justin@walkerlawsd.com*
*lorrie@walkerlawsd.com*
Tel: (619) 839-9978

GERALD SINGLETON (SBN 208783)
JOHN C. LEMON (SBN 175847)
**SINGLETON SCHREIBER, LLP**
450 A Street, 5th Floor
San Diego, CA 92101
*gsingleton@singletonschreiber.com*
*jlemon@singletonschreiber.com*
Tel: (619) 333-7479

Attorneys for Plaintiff,
PAUL HARNER, an individual

## IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL HARNER, an individual;<br><br>Plaintiff,<br><br>vs.<br><br>USAA GENERAL INDEMNITY COMPANY; and DOES 1 through 50,<br><br>Defendants. | Case No.:  18CV1993-LL-MDD<br><br>**PLAINTIFF PAUL HARNER'S REQUEST FOR JUDICIAL NOTICE**<br><br>Trial Date:   May 10, 2022<br>Trial Time:   9:00 a.m.<br>Courtroom:   2B<br>Judge:   Hon. Linda Lopez |

Pursuant to Federal Rule of Evidence 201, Plaintiff PAUL HARNER ("Plaintiff" or "Harner") requests the Court take judicial notice of the following:

- California Code of Regulations, Title 10, Chapter 5, Subchapter 7.5 ("Fair Claims Settlement Practices Regulations") Sections 2695.1 (**Exhibit A)**; 2695.2 (**Exhibit B**); and 2695.7 (**Exhibit C); and**

- The Judicial Opinion of the California Supreme Court in *Wilson v. 21st. Century Ins. Co.*, 42 Cal. 4th 713 (2007) (**Exhibit D).**

1  "The law of any State of the Union, **whether depending upon statutes or upon**
2  **judicial opinions**, is a matter of which the courts of the United States are **bound** to
3  take judicial notice, without plea or proof." *Lamar v. Micou*, 114 U.S. 218, 223 (1885)
4  (emphasis added) (*cited by Judith Basin Land Co. v. Fergus County*, 50 F.2d 792, 794
5  (9th Cir. 1931) and *Aki Family Ltd. P'ship v. City of San Marcos*, 2007 U.S. Dist.
6  LEXIS 12986 at *3, n.2 (Southern Dist. Cal. 2007) (taking judicial notice of San
7  Marcos municipal code)); *See also, Washington-Alaska Bank v. Dexter Horton Nat'l*
8  *Bank*, 263 F. 304, 312 (9th Cir. 1920) ("The court below was bound to take judicial
9  notice of the statutes of Nevada.").

10  "The Court may take judicial notice of state laws, **regulations**, and other
11  matters of public record." *Labowitz v. Bird Rides, Inc.*, 2020 U.S. Dist. LEXIS 84573
12  at *24 (March 31, 2020) (emphasis added) *citing Reyn's Pasta Bella, LLC v. Visa*
13  *USA, Inc.,* 442 F.3d 741, 746 n.6 (9th Cir. 2006).  "[F]ederal courts can take judicial
14  notice of state statutes and **administrative regulations**." *D&L Framing v. Clarendon*
15  *Am. Ins. Co.*, 2007 U.S. Dist. LEXIS 115666 at *6 (emphasis added).

16  Federal Rule of Evidence 201 governs judicial notice of "adjudicative facts,"
17  which "are the facts that normally go to the jury in a jury case.  They relate to the
18  parties, their activities, their properties, their businesses." Fed R. Evid. 201 Advisory
19  Committee Notes.  FRE 201 provides that "[t]he court may judicially notice a fact that
20  is not subject to reasonable dispute because it: (1) is generally known within the trial
21  court's territorial jurisdiction; or (2) can be accurately and readily determined from
22  sources whose accuracy cannot reasonably be questioned." Fed R. Evid. 201(b).  "The
23  Court [] must take judicial notice if a party requests it and the court is supplied with
24  the necessary information."  Fed R. Evid. 201(c)(2).  **"The court may take judicial**
25  **notice at any stage of the proceeding."**  Fed R. Evid. 201(d) (emphasis added).  "In
26  a civil case, the court must instruct the jury to accept the noticed fact as conclusive."
27  Fed R. Evid. 201(f).

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**WALKER LAW, PC**

Dated: April 13, 2022

By: ____/s/ Justin O. Walker_____
JUSTIN O. WALKER
LORRIE A. WALKER
Attorneys for Plaintiff, PAUL
HARNER

# Exhibit A

THOMSON REUTERS
**WESTLAW**   California Code of Regulations

Home Table of Contents

**§ 2695.1. Preamble.**
10 CA ADC § 2695.1
BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS

Barclays Official California Code of Regulations Currentness
   Title 10. Investment
     Chapter 5. Insurance Commissioner
       Subchapter 7.5. Unfair or Deceptive Acts or Practices in the Business of Insurance
         Article 1. Fair Claims Settlement Practices Regulations

10 CCR § 2695.1

§ 2695.1. Preamble.

(a) Section 790.03(h) of the California Insurance Code enumerates sixteen claims settlement practices that, when either knowingly committed on a single occasion, or performed with such frequency as to indicate a general business practice, are considered to be unfair claims settlement practices and are, thus, prohibited by this section of the California Insurance Code. The Insurance Commissioner has promulgated these regulations in order to accomplish the following objectives:

   (1) To delineate certain minimum standards for the settlement of claims which, when violated knowingly on a single occasion or performed with such frequency as to indicate a general business practice shall constitute an unfair claims settlement practice within the meaning of Insurance Code Section 790.03(h);

   (2) To promote the good faith, prompt, efficient and equitable settlement of claims on a cost effective basis;

   (3) To discourage and monitor the presentation to insurers of false or fraudulent claims; and,

   (4) To encourage the prompt and thorough investigation of suspected fraudulent claims and ensure the prompt and comprehensive reporting of suspected fraudulent claims as required by Insurance Code Section 1872.4.

(b) These regulations are not meant to provide the exclusive definition of all unfair claims settlement practices. Other methods, act(s), or practices not specifically delineated in this set of regulations may also be unfair claims settlement practices and subject to California Insurance Code Section 790.03(h) and/or California Insurance Code Section 790.06. These regulations are applicable to the handling or settlement of all claims subject to Article 6.5 of Division 1, Part 2, Chapter 1 of the California Insurance Code, commencing with Section 790, except as specifically provided below:

   (1) Workers' compensation insurance;

   (2) Liability insurance for the professional malpractice of health care providers as defined in California Code of Civil Procedure Section 364(f)(1);

   (3) Self insured or self funded plans which are bona fide Employee Retirement Income Security Act ("ERISA") plans which are not also multiple employer welfare arrangements, to the extent that these ERISA plans are not covered by insurance;

   (4) Any other self funded or self insured plan, to the extent it is not covered by insurance, which is lawfully conducting business in this state.

(c) In recognition of both the unique relationship which exists under a surety bond between the surety, the obligee or beneficiary, and the principal, and the fact that the processing of surety claims is subject to the Unfair Practices Act, beginning with California Insurance Code Section 790, only sections 2695.1 through 2695.6, inclusive, section 2695.10, and sections 2695.12, 2695.13 and 2695.14, inclusive, shall apply to the handling or settlement of claims brought under surety bonds.

(d) These regulations apply to home protection contracts and home protection companies defined in California Insurance Code Section 12740.

(e) All licensees, as defined in these regulations, shall have thorough knowledge of the regulations contained in this subchapter.

(f) Policy provisions relating to the investigation, processing and settlement of claims shall be consistent with or more favorable to the insured than the provisions of these regulations.

(g) The California Insurance Code provides the commissioner with access to all records of an insurer and the power to examine the affairs of every person engaged in the business of insurance to determine if such person is engaged in any unfair or deceptive act or practice. California Insurance Code Section 790.03(h) requires all persons engaged in the business of insurance to effectuate prompt, fair and equitable settlements of claims and to otherwise process claims in a fair and reasonable manner. The Department considers the use of reliable information to be an essential element of the fair and equitable settlement of claims. The fact that information, data or statistical methods used or relied upon by a licensee to process or establish the value of insurance claims is obtained through a third party source shall not absolve the licensee of its legal responsibility to comply with these regulations or to effectuate prompt, fair and equitable settlements of claims. Failure of a licensee to provide the commissioner with requested information sufficient to examine the licensee's claims handling practices may justify a finding that the licensee was in non-compliance with these regulations or other applicable insurance code provisions. Any and all information received pursuant to the Department's request shall be given confidential treatment, as provided in California Insurance Code section 735.5 and California Government Code Section 11180 et seq. When processing or establishing the value of a claim, a licensee shall not be responsible for the accuracy of information provided by a governmental entity, unless the licensee has discovered or been notified of the inaccuracy and has continued to use the information.

Note: Authority cited: Sections 790.034, 790.10, 1871.1, 12340-12417, inclusive, 12921 and 12926, Insurance Code; and Sections 11152 and 11342.2, Government Code. Reference: Sections 735.5, 790.03(h) and 12740, Insurance Code; and Section 11180, Government Code.

## HISTORY

1. New subchapter 7.5 (sections 2695.1-2695.17) filed 12-15-92; operative 1-14-93 (Register 92, No. 52).

2. Editorial correction of printing error in History 1. (Register 93, No. 4).

3. Amendment of subchapter heading and subsection (b), new subsections (b)(1)-(b)(4), repealer and new subsection (c), amendment of subsection (d), repealer of subsection (e) and subsection relettering filed 1-10-97; operative 5-10-97 (Register 97, No. 2).

4. Amendment of subchapter heading and new article 1 heading filed 2-13-2001 as an emergency; operative 2-13-2001 (Register 2001, No. 7). A Certificate of Compliance must be transmitted to OAL by 6-13-2001 or emergency language will be repealed by operation of law on the following day.

5. Amendment of subchapter heading and new article 1 heading refiled 6-1-2001 as an emergency; operative 6-13-2001 (Register 2001, No. 22). A Certificate of Compliance must be transmitted to OAL by 10-11-2001 or emergency language will be repealed by operation of law on the following day.

6. Amendment of subchapter heading and new article 1 heading refiled 10-11-2001 as an emergency; operative 10-11-2001 (Register 2001, No. 41). A Certificate of Compliance must be transmitted to OAL by 2-8-2002 or emergency language will be repealed by operation of law on the following day.

7. Certificate of Compliance as to 10-11-2001 order transmitted to OAL 11-14-2001 and filed 12-31-2001 (Register 2002, No. 1).

8. Amendment of section and Note filed 4-24-2003; operative 7-23-2003 (Register 2003, No. 17).

9. Inclusion of informational note following article heading filed 3-1-2004 (Register 2004, No. 10).

10. Change without regulatory effect filed 8-4-2004 repealing the informational note following article heading; depublishing the amendments to the insurance claims handling practices regulations that were approved by OAL 4-24-2003, but were enjoined in Personal Insurance Federation and The Surety Association of America v. John Garamendi; and reinstating replacement regulations that were either (1) in effect prior to OAL's 4-24-2003 approval of the amendments to the regulations or (2) were found by the court to be valid, as amended, all pursuant to a court-approved settlement agreement dated 6-7-2004 (Register 2004, No. 32).

11. Amendment of subsection (b), repealer and new subsection (c), new subsection (g) and amendment of Note filed 6-1-2006; operative 8-30-2006 (Register 2006, No. 22).

This database is current through 4/1/22 Register 2022, No. 13

10 CCR § 2695.1, 10 CA ADC § 2695.1

**END OF DOCUMENT**

# Exhibit B

THOMSON REUTERS
**WESTLAW**    California Code of Regulations

Home Table of Contents

§ 2695.2. Definitions.
10 CA ADC § 2695.2
BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS

Barclays Official California Code of Regulations Currentness
 Title 10. Investment
  Chapter 5. Insurance Commissioner
   Subchapter 7.5. Unfair or Deceptive Acts or Practices in the Business of Insurance
    Article 1. Fair Claims Settlement Practices Regulations

10 CCR § 2695.2

## § 2695.2. Definitions.

As used in these regulations:

(a) "Beneficiary" means:

 (1) for the purpose of life and disability claims, the party or parties entitled to receive the proceeds or benefits occurring under the policy in lieu of the insured; or,

 (2) for the purpose of surety claims, a person who is within the class of persons intended to benefit from the bond;

(b) "Calendar days" means each and every day including Saturdays, Sundays, Federal and California State Holidays, but if the last day for performance of any act required by these regulations falls on a Saturday, Sunday, Federal or State Holiday, then the period of time to perform the act is extended to and including the next calendar day which is not a Saturday, Sunday, or Federal or State holiday;

(c) "Claimant" means a first or third party claimant as defined in these regulations, any person who asserts a right of recovery under a surety bond, an attorney, any person authorized by operation of law to represent the claimant, or any of the following persons properly designated by the claimant in the manner specified in subsection 2695.5(c): an insurance adjuster, a public adjuster, or any member of the claimant's family.

(d) "Claims agent" means any person employed or authorized by an insurer, to conduct an investigation of a claim on behalf of an insurer or a person who is licensed by the Commissioner to conduct investigations of claims on behalf of an insurer. The term "claims agent", however, shall not include the following:

 (1) an attorney retained by an insurer to defend a claim brought against an insured; or,

 (2) persons hired by an insurer solely to provide valuation as to the subject matter of a claim.

(e) "Extraordinary circumstances" means circumstances outside of the control of the licensee which severely and materially affect the licensee's ability to conduct normal business operations;

(f) "First party claimant" means any person asserting a right under an insurance policy as a named insured, other insured or beneficiary under the terms of that insurance policy, and including any person seeking recovery of uninsured motorist benefits;

(g) "Gross settlement amount" means the amount tendered plus the amount deducted as provided in the policy in the settlement of an automobile total loss claim;

(h) "Insurance agent" means:

 (1) the term "insurance agent" as used in section 31 of the California Insurance Code; or,

 (2) the term "life agent" as used in section 32 of the California Insurance Code; or,

 (3) any person who has authority or responsibility to notify an insurer of a claim upon receipt of a notice of claim by a claimant; or,

 (4) an underwritten title company.

(i) "Insurer" means a person licensed to issue or that issues an insurance policy or surety bond in this state, or that otherwise transacts the business of insurance in the state, including reciprocal and interinsurance exchanges, fraternal benefit societies, stock and mutual insurance companies, risk retention groups, California county mutual fire insurance companies, grants and annuities societies, entities holding certificates of exemption, non-profit hospital service plans, multiple employer welfare arrangements holding certificates of compliance pursuant to Article 4.7 of the California Insurance Code, and motor clubs, to the extent that they transact the business of insurance in the State. The term "insurer" for purposes of these regulations includes non-admitted insurers, the California FAIR Plan, the California Earthquake Authority, those persons licensed to issue or that issue an insurance policy pursuant to an assignment by the California Automobile Assigned Risk Plan, home protection companies as defined under California Insurance Code Section 12740, and any other entity subject to California Insurance Code Section 790.03(h). The term "insurer" shall not include insurance agents and brokers, surplus line brokers and special lines surplus line brokers.

(j) "Insurance policy" or "policy" means the written instrument in which any certificate of group insurance, contract of insurance, or non-profit hospital service plan is set forth. For the purposes of these regulations the terms insurance policy or policy do not include "surety bond" or "bond". For the purposes of these regulations the term insurance policy or policy includes a home protection contract or any written instrument in which any certificate of insurance or contract of insurance is set forth that is issued pursuant to the California Automobile Assigned Risk Plan, the California Earthquake Authority, or the California FAIR Plan;

(k) "Investigation" means all activities of an insurer or its claims agent related to the determination of coverage, liabilities, or nature and extent of loss or damage for which benefits are afforded by an insurance policy, obligations or duties under a bond, and other obligations or duties arising from an insurance policy or bond.

(l ) "Knowingly committed" means performed with actual, implied or constructive knowledge, including, but not limited to, that which is implied by operation of law.

(m) "Licensee" means any person that holds a license or Certificate of Authority from the Insurance Commissioner, or any other entity for whom the Insurance Commissioner's consent is required before transacting business in the State of California or with California residents. The term "licensee" for purpose of these regulations does not include an underwritten title company if the underwriting agreement between the underwritten title company and the title insurer affirmatively states that the underwritten title company is not authorized to handle policy claims on behalf of the title insurer.

(n) "Notice of claim" means any written or oral notification to an insurer or its agent that reasonably apprises the insurer that the claimant wishes to make a claim against a policy or bond issued by the insurer and that a condition giving rise to the insurer's obligations under that policy or bond may have arisen. For purposes of these regulations the term "notice of claim" shall not include any written or oral communication provided by an insured or principal solely for informational or incident reporting purposes.

(o) "Notice of legal action" means notice of an action commenced against the insurer with respect to a claim, or notice of action against the insured received by the insurer, or notice of action against the principal under a bond, and includes any arbitration proceeding;

(p) "Obligee" means the person named as obligee in a bond;

(q) "Person" means any individual, association, organization, partnership, business, trust, corporation or other entity;

(r) "Principal" means the person whose debt or other obligation is secured or guaranteed by a bond and who has the primary duty to pay the debt or discharge the obligation;

(s) "Proof of claim" means any evidence or documentation in the possession of the insurer, whether as a result of its having been submitted by the claimant or obtained by the insurer in the course of its investigation, that provides any evidence of the claim and that reasonably supports the magnitude or the amount of the claimed loss.

(t) "Remedial measures" means those actions taken by an insurer to correct or cure any error or omission in the handling of claims on the part of its insurance agent as defined in subsection 2695.2(h), including, but not limited to:

    (1) written notice to the insurance agent that the insurance agent is in violation of the regulations contained in this subchapter;

    (2) transmission of a copy of the regulations contained in this subchapter and instructions for their implementation;

    (3) reporting the error or omission in the handling of claims by the insurance agent to the Department of Insurance;

(u) "Replacement crash part" means a replacement for any of the nonmechanical sheet metal or plastic parts which generally constitute the exterior of a motor vehicle, including inner and outer panels;

(v) "Single act" for the purpose of determining any penalty pursuant to California Insurance Code Section 790.035 is any commission or omission which in and of itself constitutes a violation of California Insurance Code Section 790.03 or this subchapter;

(w) "Surety bond" or "bond" means the written instrument in which a contract of surety insurance, as defined in California Insurance Code Section 105, is set forth;

(x) "Third party claimant" means any person asserting a claim against any person or the interests insured under an insurance policy;

(y) "Willful" or "Willfully" when applied to the intent with which an act is done or omitted means simply a purpose or willingness to commit the act, or make the omission referred to in the California Insurance Code or this subchapter. It does not require any intent to violate law, or to injure another, or to acquire any advantage.

Note: Authority cited: Sections 132(d), 790.10, 12340-12417, inclusive, 12921 and 12926, Insurance Code; Section 995.130, Code of Civil Procedure; and Sections 11152 and 11342.2, Government Code. Reference: Sections 31, 32, 101, 106, 675.5(b), (c) and (d), 676.6, 790.03(h) and 10082, Insurance Code.

### HISTORY

1. New section filed 12-15-92; operative 1-14-93 (Register 92, No. 52).

2. Amendment filed 1-10-97; operative 5-10-97 (Register 97, No. 2).

3. Amendment of subsections (a)(2), (g) and (i)-(l ) and amendment of Note filed 4-24-2003; operative 7-23-2003 (Register 2003, No. 17).

4. Amendment of subsection (s) filed 6-5-2003; operative 9-3-2003 pursuant to title 10, section 2695.14, California Code of Regulations (Register 2003, No. 23).

5. Change without regulatory effect filed 8-4-2004 depublishing the amendments to the insurance claims handling practices regulations that were approved by OAL 4-24-2003, but were enjoined in Personal Insurance Federation and The Surety Association of America v. John Garamendi, and reinstating replacement regulations that were either (1) in effect prior to OAL's 4-24-2003 approval of the amendments to the regulations or (2) were found by the court to be valid, as amended, all pursuant to a court-approved settlement agreement dated 6-7-2004 (Register 2004, No. 32).

6. Amendment of subsection (s) filed 6-1-2006; operative 8-30-2006 (Register 2006, No. 22).

7. Change without regulatory effect amending subsection (t)(1) filed 7-14-2021 pursuant to section 100, title 1, California Code of Regulations (Register 2021, No. 29). Filing deadline specified in Government Code section 11349.3(a) extended 60 calendar days pursuant to Executive Order N-40-20.

This database is current through 4/1/22 Register 2022, No. 13

10 CCR § 2695.2, 10 CA ADC § 2695.2

**END OF DOCUMENT**

# Exhibit C

**THOMSON REUTERS**
**WESTLAW**    California Code of Regulations

Home Table of Contents

**§ 2695.7. Standards for Prompt, Fair and Equitable Settlements.**
10 CA ADC § 2695.7
BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS

Barclays Official California Code of Regulations Currentness
    Title 10. Investment
        Chapter 5. Insurance Commissioner
            Subchapter 7.5. Unfair or Deceptive Acts or Practices in the Business of Insurance
                Article 1. Fair Claims Settlement Practices Regulations

10 CCR § 2695.7

§ 2695.7. Standards for Prompt, Fair and Equitable Settlements.

(a) No insurer shall discriminate in its claims settlement practices based upon the claimant's age, race, gender, income, religion, language, sexual orientation, ancestry, national origin, or physical disability, or upon the territory of the property or person insured.

(b) Upon receiving proof of claim, every insurer, except as specified in subsection 2695.7(b)(4) below, shall immediately, but in no event more than forty (40) calendar days later, accept or deny the claim, in whole or in part. The amounts accepted or denied shall be clearly documented in the claim file unless the claim has been denied in its entirety.

    (1) Where an insurer denies or rejects a first party claim, in whole or in part, it shall do so in writing and shall provide to the claimant a statement listing all bases for such rejection or denial and the factual and legal bases for each reason given for such rejection or denial which is then within the insurer's knowledge. Where an insurer's denial of a first party claim, in whole or in part, is based on a specific statute, applicable law or policy provision, condition or exclusion, the written denial shall include reference thereto and provide an explanation of the application of the statute, applicable law or provision, condition or exclusion to the claim. Every insurer that denies or rejects a third party claim, in whole or in part, or disputes liability or damages shall do so in writing.

    (2) Subject to the provisions of subsection 2695.7(k), nothing contained in subsection 2695.7(b)(1) shall require an insurer to disclose any information that could reasonably be expected to alert a claimant to the fact that the subject claim is being investigated as a suspected fraudulent claim.

    (3) Written notification pursuant to this subsection shall include a statement that, if the claimant believes all or part of the claim has been wrongfully denied or rejected, the claimant may have the matter reviewed by the California Department of Insurance, and shall include the address and telephone number of the unit of the Department which reviews claims practices.

    (4) The time frame in subsection 2695.7(b) shall not apply to claims arising from policies of disability insurance subject to Section 10123.13 of the California Insurance Code, disability income insurance subject to Section 10111.2 of the California Insurance Code or mortgage guaranty insurance subject to Section 12640.09(a) of the California Insurance Code, and shall not apply to automobile repair bills arising from policies of automobile collision and comprehensive insurance subject to Section 560 of the California Insurance Code. All other provisions of subsections 2695.7(b)(1), (2), and (3) are applicable.

(c)(1) If more time is required than is allotted in subsection 2695.7(b) to determine whether a claim should be accepted and/or denied in whole or in part, every insurer shall provide the claimant, within the time frame specified in subsection 2695.7(b), with written notice of the need for additional time. This written notice shall specify any additional information the insurer requires in order to make a determination and state any continuing reasons for the insurer's inability to make a determination. Thereafter, the written notice shall be provided every thirty (30) calendar days until a determination is made or notice of legal action is served. If the determination cannot be made until some future event occurs, then the insurer shall comply with this continuing notice requirement by advising the claimant of the situation and providing an estimate as to when the determination can be made.

    (2) Subject to the provisions of subsection 2695.7(k), nothing contained in subsection 2695.7(c)(1) shall require an insurer to disclose any information that could reasonably be expected to alert a claimant to the fact that the claim is being investigated as a possible suspected fraudulent claim.

(d) Every insurer shall conduct and diligently pursue a thorough, fair and objective investigation and shall not persist in seeking information not reasonably required for or material to the resolution of a claim dispute.

(e) No insurer shall delay or deny settlement of a first party claim on the basis that responsibility for payment should be assumed by others, except as may otherwise be provided by policy provisions, statutes or regulations, including those pertaining to coordination

of benefits.

(f) Except where a claim has been settled by payment, every insurer shall provide written notice of any statute of limitation or other time period requirement upon which the insurer may rely to deny a claim. Such notice shall be given to the claimant not less than sixty (60) days prior to the expiration date; except, if notice of claim is first received by the insurer within that sixty days, then notice of the expiration date must be given to the claimant immediately. With respect to a first party claimant in a matter involving an uninsured motorist, this notice shall be given at least thirty (30) days prior to the expiration date; except, if notice of claim is first received by the insurer within that thirty days, then notice of the expiration date must be given to the claimant immediately. This subsection shall not apply to a claimant represented by counsel on the claim matter.

(g) No insurer shall attempt to settle a claim by making a settlement offer that is unreasonably low. The Commissioner shall consider any admissible evidence offered regarding the following factors in determining whether or not a settlement offer is unreasonably low:

(1) the extent to which the insurer considered evidence submitted by the claimant to support the value of the claim;

(2) the extent to which the insurer considered legal authority or evidence made known to it or reasonably available;

(3) the extent to which the insurer considered the advice of its claims adjuster as to the amount of damages;

(4) the extent to which the insurer considered the advice of its counsel that there was a substantial likelihood of recovery in excess of policy limits;

(5) the procedures used by the insurer in determining the dollar amount of property damage;

(6) the extent to which the insurer considered the probable liability of the insured and the likely jury verdict or other final determination of the matter;

(7) any other credible evidence presented to the Commissioner that demonstrates that (i) any amount offered by the insurer in settlement of a first-party claim to an insured not represented by counsel, or (ii) the final amount offered in settlement of a first-party claim to an insured who is represented by counsel or (iii) the final amount offered in settlement of a third party claim by the insurer is below the amount that a reasonable person with knowledge of the facts and circumstances would have offered in settlement of the claim.

(h) Upon acceptance of the claim in whole or in part and, when necessary, upon receipt of a properly executed release, every insurer, except as specified in subsection 2695.7(h)(1) and (2) below, shall immediately, but in no event more than thirty (30) calendar days later, tender payment or otherwise take action to perform its claim obligation. The amount of the claim to be tendered is the amount that has been accepted by the insurer as specified in subsection 2695.7(b). In claims where multiple coverage is involved, and where the payee is known, amounts that have been accepted by the insurer shall be paid immediately, but in no event more than thirty (30) calendar days, if payment would terminate the insurer's known liability under that individual coverage, unless impairment of the insured's interests would result. The time frames specified in this subsection shall not apply where the policy provides for a waiting period after acceptance of claim and before payment of benefits.

(1) The time frame specified in subsection 2695.7(h) shall not apply to claims arising from policies of disability insurance subject to Section 10123.13 of the California Insurance Code, disability income insurance subject to Section 10111.2 of the California Insurance Code, or of mortgage guaranty insurance subject to Section 12640.09(a) of the California Insurance Code, and shall not apply to automobile repair bills subject to Section 560 of the California Insurance Code. All other provisions of Section 2695.7(h) are applicable.

(2) Any insurer issuing a title insurance policy shall either tender payment pursuant to subsection 2695.7(h) or take action to resolve the problem which gave rise to the claim immediately upon, but in no event more than thirty (30) calendar days after, acceptance of the claim.

(i) No insurer shall inform a claimant that said claimant's rights may be impaired if a form or release is not completed within a specified time period unless the information is given for the purpose of notifying the claimant of any applicable statute of limitations or policy provision or the time limitation within which claims are required to be brought against state or local entities.

(j) No insurer shall request or require an insured to submit to a polygraph examination unless authorized under the applicable insurance contract and state law.

(k) Subject to the provisions of subsection 2695.7(c), where there is a reasonable basis, supported by specific information available for review by the California Department of Insurance, for the belief that the claimant has submitted or caused to be submitted to an insurer a suspected false or fraudulent claim as specified in California Penal Code Section 550 or California Insurance Code Section 1871.4(a), the number of calendar days specified in subsection 2695.7(b) shall be:

(1) increased to eighty (80) calendar days; or,

(2) suspended until otherwise ordered by the Commissioner, provided the insurer has complied with California Insurance Code Section 1872.4 and the insurer can demonstrate to the Commissioner that it has made a diligent attempt to determine whether the subject claim is false or fraudulent within the eighty day period specified by subsection 2695.7(k)(1).

(l ) No insurer shall deny a claim based upon information obtained in a telephone conversation or personal interview with any source unless the telephone conversation or personal interview is documented in the claim file pursuant to the provisions of Section 2695.3.

(m) No insurer shall make a payment to a provider, pursuant to a policy provision to pay medical benefits, and thereafter seek recovery or set-off from the insured on the basis that the amount was excessive and/or the services were unnecessary, except in the event of a proven false or fraudulent claim, subject to the provisions of Section 10123.145 of the California Insurance Code.

(n) Every insurer requesting a medical examination for the purpose of determining liability under a policy provision shall do so only when the insurer has a good faith belief that such an examination is reasonably necessary.

(o) No insurer shall require that a claimant withdraw, rescind or refrain from submitting any complaint to the California Department of Insurance regarding the handling of a claim or any other matter complained of as a condition precedent to the settlement of any claim.

(p) Every insurer shall provide written notification to a first party claimant as to whether the insurer intends to pursue subrogation of the claim. Where an insurer elects not to pursue subrogation, or discontinues pursuit of subrogation, it shall include in its notification a statement that any recovery to be pursued is the responsibility of the first party claimant. This subsection does not require notification if the deductible is waived, the coverage under which the claim is paid requires no deductible to be paid, the loss sustained does not exceed the applicable deductible, or there is no legal basis for subrogation.

(q) Every insurer that makes a subrogation demand shall include in every demand the first party claimant's deductible. Every insurer shall share subrogation recoveries on a proportionate basis with the first party claimant, unless the first party claimant has otherwise recovered the whole deductible amount. No insurer shall deduct legal or other expenses from the recovery of the deductible unless the insurer has retained an outside attorney or collection agency to collect that recovery. The deduction may only be for a pro rata share of the allocated loss adjustment expense. This subsection shall not apply when multiple policies have been issued to the insured(s) covering the same loss and the language of these contracts prescribe alternative subrogation rights. Further, this subsection shall not apply to disability and health insurance as defined in California Insurance Code Section 106.

Note: Authority cited: Sections 553, 554, 790.03(h)(5), 790.03(h)(12), 790.10, 1861.03(a), 10350.10, 10111.2, 11580.2(k), 12340-12417, inclusive, 12921 and 12926, Insurance Code; Sections 11152 and 11342.2, Government Code; Egan v. Mutual of Omaha Insurance Company (1979) 24 Cal.3d 809 [169 Cal.Rptr. 691]; KPFF, Inc. v. California Union Insurance Company (1997) 56 Cal.App.4th 963 [66 Cal.Rptr.2d 36] (certified for partial publication); and Betts v. Allstate Ins. Co. (1984) 154 Cal.App.3d 688 [201 Cal.Rptr. 528]. Reference: Section 790.03(h)(2), (3), (4), (5), (13) and (15) and 1872.4, Insurance Code; Section 6149.5, Business and Professions Code; and Section 550, Penal Code.

## HISTORY

1. New section filed 12-15-92; operative 1-14-93 (Register 92, No. 52).

2. Amendment of section heading, section and Note filed 1-10-97; operative 5-10-97 (Register 97, No. 2).

3. Amendment of section and Note filed 4-24-2003; operative 7-23-2003 (Register 2003, No. 17).

4. Editorial correction of subsection (b) inserting phrase inadvertently omitted from text approved 4-24-2003; filed 7-8-2003; operative 7-23-2003 (Register 2003, No. 28).

5. Change without regulatory effect filed 8-4-2004 depublishing the amendments to the insurance claims handling practices regulations that were approved by OAL 4-24-2003, but were enjoined in Personal Insurance Federation and The Surety Association of America v. John Garamendi, and reinstating replacement regulations that were either (1) in effect prior to OAL's 4-24-2003 approval of the amendments to the regulations or (2) were found by the court to be valid, as amended, all pursuant to a court-approved settlement agreement dated 6-7-2004 (Register 2004, No. 32).

6. Amendment of subsections (b)(1) and (g)(7) and amendment of Note filed 6-1-2006; operative 8-30-2006 (Register 2006, No. 22).

7. Change without regulatory effect amending subsections (b)(3) and (i) filed 7-14-2021 pursuant to section 100, title 1, California Code of Regulations (Register 2021, No. 29). Filing deadline specified in Government Code section 11349.3(a) extended 60 calendar days pursuant to Executive Order N-40-20.

This database is current through 4/1/22 Register 2022, No. 13

10 CCR § 2695.7, 10 CA ADC § 2695.7

**END OF DOCUMENT**

# Exhibit D

# Wilson v. 21st Century Ins. Co.

Supreme Court of California

November 29, 2007, Filed

S141790

**Reporter**

42 Cal. 4th 713 *; 171 P.3d 1082 **; 68 Cal. Rptr. 3d 746 ***; 2007 Cal. LEXIS 13314 ****

REAGAN WILSON, Plaintiff and Appellant, v. 21ST CENTURY INSURANCE COMPANY, Defendant and Respondent.

**Subsequent History:** Reported at Wilson (Reagan) v. 21st Century Insurance Company, 2007 Cal. LEXIS 13848 (Cal., Nov. 29, 2007)

Modified by Wilson (Reagan) v. 21st Century Insurance Company, 2007 Cal. LEXIS 14848 (Cal., Dec. 19, 2007)

Modified by Wilson v. 21st Century Ins. Co., 2007 Cal. LEXIS 14292 (Cal., Dec. 19, 2007)

Request granted, Modified by Wilson (Reagan) v. 21st Century Insurance Company, 2007 Cal. LEXIS 14452 (Cal., Dec. 19, 2007)

**Prior History:** [****1] Court of Appeal of California, Second Appellate District, Division Seven, No. B180323. Superior Court of Los Angeles County, No. BC301588, Paul Gutman, Judge.

Wilson v. 21st Century Ins. Co., 136 Cal. App. 4th 97, 38 Cal. Rptr. 3d 514, 2006 Cal. App. LEXIS 114 (Cal. App. 2d Dist., 2006)

**Disposition:** The court affirmed the judgment of the court of appeal.

## Case Summary

### Procedural Posture

The trial court granted summary judgment for defendant insurer in plaintiff insured's first party insurance bad faith action. The Court of Appeal of California, Second District, Division Seven, reversed, holding that triable issues of fact existed as to whether the insurer had thoroughly

investigated and objectively evaluated the insured's claim on her underinsured motorist (UIM) coverage before denying it. The insurer sought further review.

## Overview

The insured's treating physician opined that the insured had degenerative disk changes as a result of injuries from a motor vehicle accident. The insurer's claims examiner asserted in an internal denial memo that it was unlikely the insured's disk bulges were caused by the accident and that her claims of severe pain should be discounted because of a trip to Australia. The court held that summary judgment on the insured's bad faith action was improper because a jury could have found that the insurer reached its medical conclusion without a good faith investigation and without a reasonable basis for genuine dispute. The insurer directed the court to no medical report on the basis of which the claims examiner could reasonably have disbelieved the physician's conclusion. Nor was there any apparent medical basis for the examiner's assertion that the insured had preexisting degenerative disc disease. No such diagnosis appeared in the medical reports submitted to the insurer, and there was no evidence that the examiner had the expertise to make such a diagnosis. The court agreed with the court of appeal that it was as possible to suffer severe pain in Australia as in Southern California.

## Outcome

The court affirmed the judgment of the court of appeal.

**Counsel:** Hall & Bailey, Donald R. Hall; The Ehrlich Law Firm and Jeffrey Isaac Ehrlich for Plaintiff and Appellant.

Horvitz & Levy, Barry R. Levy, Bradley S. Pauley; Lewis Brisbois Bisgaard & Smith and N. David Lyons for Defendant and Respondent.

Robie & Matthai, James R. Robie, Kyle Kveton and Steven S. Fleischman for State Farm Mutual Automobile Insurance Company, United Services Automobile Association, Infinity Insurance Company, Farmers Insurance Exchange, Fire Insurance Exchange, Truck Insurance Exchange and Mid-Century Insurance Company as Amici Curiae on behalf of Defendant and Respondent.

**Judges:** Opinion by Werdegar, J., with George, C. J., Kennard, Moreno, and Kline, JJ., concurring. Dissenting opinion by Chin, J., with Baxter, J., concurring.

**Opinion by:** Werdegar

# Opinion

 [**1084]  [***748] **WERDEGAR, J.**—In this first party insurance bad faith action, the question on review is whether summary judgment was properly  [****2] granted for the insurer. Eight months after plaintiff Reagan Wilson was injured in an automobile accident by a drunk driver, her insurer, defendant 21st Century Insurance Company (21st Century), rejected her demand for payment of the $ 100,000 policy limit on her underinsured motorist coverage. Although Wilson's treating physician had opined that the 21-year-old woman had "degenerative disk changes as a result of occult disk injury at the levels in her neck from her high speed motor vehicle accident," and that these spinal changes were atypical for her age and "almost certainly" caused by the automobile accident, 21st Century rejected the claim on the asserted ground that she had suffered only soft tissue injuries in the collision and had "preexisting" degenerative disk disease. Because, based on the undisputed facts in the summary judgment record, a jury could reasonably find 21st Century reached this medical conclusion without a good faith investigation of the claim and without a reasonable basis for genuine dispute, we agree with the Court of Appeal that summary judgment on plaintiff's bad faith cause of action was improper.

FACTUAL AND PROCEDURAL BACKGROUND

"Because this case comes  [****3] before us after the trial court granted a motion [***749]  for summary judgment, we take the facts from the record that was before the [*717]  trial court when it ruled on that motion. (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1034–1035 [6 Cal. Rptr. 3d 441, 79 P.3d 556].) ' "We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' (*Id.* at p. 1035.) We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal. Rptr. 3d 615, 88 P.3d 517].)" (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 [32 Cal. Rptr. 3d 436, 116 P.3d 1123].)

The summary judgment record reflects the following facts:

42 Cal. 4th 713, *717; 171 P.3d 1082, **1084; 68 Cal. Rptr. 3d 746, ***749; 2007 Cal. LEXIS 13314, ****3

On November 22, 2000, an intoxicated driver made a left turn directly in front of the vehicle Wilson was driving, resulting in a collision. She was treated at an emergency room in Monterey for bruises and a wrist injury; she also complained of pain in her chest and upon moving her neck. Several days later she told Dr. Douglas Jackson in Santa Barbara, where she was attending college, that she was [****4] still feeling pain in her neck and left shoulder, as well as in her left wrist. A "limited" cervical spine X-ray ordered by Dr. Jackson was evaluated as "normal," with "[m]ild straightening of lordosis" but "no fracture, degenerative change or soft tissue swelling." [1] Dr. Jackson prescribed physical therapy for the neck pain.

 [**1085] On January 29, 2001, Wilson was examined by Edward Southern, an orthopedist in Long Beach. She reported continued neck, back and arm pain. Not having the prior film before him, Dr. Southern ordered additional cervical spine X-rays, which he found showed "reversal of the cervical lordosis with calcification of the anterior disk spaces at C4-5 and C5-6 with narrowing of the disk space more so at C5-6." Dr. Southern ordered a magnetic resonance imaging scan (MRI) to determine whether the "obviously degenerative motion segment within her cervical spine" was causing the arm pain. If the MRI was "markedly abnormal," Dr. Southern noted, Wilson might have to delay her planned departure for a period of [****5] study in Australia.

Dr. Southern's clinical impression was as follows: "A young woman involved in a high speed motor vehicle accident with changes now in the cervical spine which are atypical for a patient of her age and are almost certainly due to the history of trauma. She probably has degenerative disk [*718] changes as a result of occult disk injury at the levels in the neck from her high speed motor vehicle accident." [2]

The MRI showed "mild desiccated discs at C2-3, C3-4, C4-5, C5-6 and C6-7," "mild dextroscoliosis" and "2mm or less posterior disc bulges at C4-5, C5-6 and C6-7," while "the

---

[1] Cervical (neck) lordosis is "the normal, anteriorly convex curvature of the cervical segment of the vertebral column." (Stedman's Medical Dict. (27th ed. 2000) p. 1032.)

[2] "Occult" is used here in the sense of "[h]idden; concealed; not manifest." (Stedman's Medical Dict., *supra*, at p. 1251.)

42 Cal. 4th 713, *718; 171 P.3d 1082, **1085; 68 Cal. Rptr. 3d 746, ***749; 2007 Cal. LEXIS 13314, ****5

central canal and neural foramina are patent at these levels."[3]  [***750]  "No significant disc pathology" was found at other levels.

In February 2001, Donald Hall, Wilson's attorney,  [****6] told Paul Le, 21st Century's claims examiner, that his client wanted to make a claim on her underinsured motorist (UIM) coverage. In April, after Wilson reached a settlement with the other driver for his $ 15,000 liability coverage, Le asked Hall to send 21st Century a demand package so he could evaluate the UIM claim.

Hall sent Le a demand letter and documentation on June 28, 2001. The medical reports described above were attached. Hall told Le that after the accident Wilson had made a long-planned trip to Europe, which was "ruined" by her injuries. At the time of the demand letter, Hall wrote, she was studying in Australia but was still experiencing pain "on a regular basis." He quoted Dr. Southern's opinion that Wilson had suffered degenerative disk changes as a result of the automobile accident. The general damages resulting from such an injury at Wilson's young age, Hall asserted, exceeded the $ 100,000 UIM policy limits. He requested that 21st Century pay Wilson $ 85,000, the UIM policy benefit remaining after Wilson's recovery of $ 15,000 from the other driver.

Le and Hall discussed the claim by telephone on July 6, 2001. According to Le's notes of the conversation, he asked Hall  [****7] if there was any additional medical documentation for the claim. Hall said there was not, but that Dr. Southern's report indicated disk changes that would affect Wilson later in life. Le then asked, "Why is she in Australia if [her] inj[ury] [is] so severe?" and observed that Wilson "is young and may not experience any pain in future from deg[enerative] disk." Le also noted his own opinion that the "MRI does not show bulge touching the nerves."

By a memorandum dated July 9, 2001, Le sought and obtained the approval of his superior, Jay Boomer, to reject Wilson's UIM claim. In the [*719]  memo, Le wrote that Wilson "has a pre-existing condition pertaining to scolosis [*sic*], MRI shows no encroachment of a neural structure, it is unlikely that the 2mm bulge was produced by this accident. Presently, the [insured] is on

---

[3] Scoliosis is an "[a]bnormal lateral and rotational curvature of the vertebral column." Dextroscoliosis denotes a curvature to the right. (Stedman's Medical Dict., *supra*, at pp. 488, 1606.) A foramen (plural: foramina) is "[a]n aperture or perforation through a bone or a membranous structure." (*Id.* at p. 698.)

42 Cal. 4th 713, *719; 171 P.3d 1082, **1085; 68 Cal. Rptr. 3d 746, ***750; 2007 Cal. LEXIS 13314, ****7

vacation in Australia and is not expected to return until November, this discounts her attorney's allegation that the pain & suffering and injuries are severe." Le recommended offering Wilson the $ 5,000 limit of her medical payments [**1086] coverage; with the $ 15,000 received from the negligent other driver, Le asserted, this would fully compensate her. Boomer approved this course, noting [****8] his view that Wilson's injuries were "really just ST [soft tissue]."

Before making the recommendation to reject Wilson's UIM claim, Le did not attempt to contact Dr. Southern and did not speak with any other medical practitioner about the claim.

21st Century rejected Wilson's UIM claim by a letter from Le to Hall dated July 17, 2001. After noting that "the X-rays" were "normal" and paraphrasing the conclusions of the January 2001 MRI report, Le stated: "Based on the above, we believe your client sustain [*sic*] soft tissue injury superimposed by a preexisting degenerative disc disease. Therefore, we believe that your client has been fully compensated for her injuries by the payment of the $ 15,000 policy limits from North Pointe Insurance plus our Medical Payment limits of $ 5,000."

Soon after receiving 21st Century's rejection, Wilson initiated arbitration of the claim. In late 2001 and 2002, Wilson saw Dr. Southern and other physicians for her continuing neck pain. After a diskogram was performed in June 2002, one orthopedic surgeon recommended spinal fusion [***751] surgery. Wilson did not go through with the surgery at that time. In August 2002, she saw a neurosurgeon who recommended pain management [****9] instead of surgery; Wilson pursued that course, which to some extent alleviated the pain, through the remainder of 2002.

In 2002, after learning of the surgery recommendation (through deposing Wilson in preparation for arbitration), 21st Century retained independent physicians to examine Wilson and review her medical records. Stephen Nagelberg, the retained orthopedic surgeon, saw evidence on the diskogram of "bilateral leakage of C4-5, and a right-sided annular tear with leakage of C5-6." In June 2003, Dr. Nagelberg reported to 21st Century that Wilson's neck pain was caused by these disk injuries, which resulted from the November 2000 automobile accident. He recommended surgery. Allan Chan, the claims examiner now handling the case, promptly prepared a revised evaluation of Wilson's claim and requested and received authorization to pay Wilson the $ 85,000 remainder of her UIM policy limit. 21st Century paid Wilson the $85,000 on July 23, 2003.

[*720]

Wilson sued 21st Century, alleging in her second cause of action that 21st Century's denial of benefits in July 2001 and the resulting two-year delay until the UIM claim was paid in July 2003 breached the covenant of good faith and fair dealing  [****10] and caused her damages in the form of lost interest on the policy benefits, attorney fees and costs incurred to recover payment, and general damages including emotional distress. 21st Century moved for summary judgment or summary adjudication of this cause of action on the ground that its 2001 decision to refuse the UIM demand was, in light of the facts known to the company at the time, reasonable as a matter of law. The superior court granted the motion, finding no triable issue of fact as to whether 21st Century had acted in bad faith.

The Court of Appeal reversed, holding triable issues of fact existed as to whether 21st Century had thoroughly investigated and objectively evaluated Wilson's UIM claim before denying it. We granted 21st Century's petition for review.

### DISCUSSION

"A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); see also *id.*, § 437c, subd. (f) [summary adjudication of issues].) The moving party bears the burden of showing the court that the plaintiff 'has not established, and cannot reasonably expect to establish,'  [****11] the elements of his or her cause of action. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460 [30 Cal. Rptr. 3d 797, 115 P.3d 77].)"

**(1)** The law implies in every contract, including insurance policies, a covenant of good faith and fair dealing. "The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the agreement's [**1087]  benefits. To fulfill its implied obligation, an insurer must give at least as much consideration to the interests of the insured as it gives to its own interests. When the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort." (*Frommoethelydo v. Fire Ins. Exchange* (1986) 42 Cal.3d 208, 214–215 [228 Cal. Rptr. 160, 721 P.2d 41].)

I. *Lack of Thorough Investigation and Fair Evaluation*

42 Cal. 4th 713, *720; 171 P.3d 1082, **1087; 68 Cal. Rptr. 3d 746, ***751; 2007 Cal. LEXIS 13314, ****11

**(2)** While an insurance company has no obligation under the implied covenant of good faith and fair dealing to pay [***752] every claim its insured makes, the insurer cannot deny the claim "without fully investigating the grounds for its denial." (*Frommoethelydo v. Fire Ins. Exchange*, *supra*, 42 Cal.3d at [*721] p. 215.) To protect its insured's contractual interest in security and peace of mind, "it is essential that an insurer fully inquire [****12] into possible bases that might support the insured's claim" before denying it. (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 819 [169 Cal. Rptr. 691, 620 P.2d 141].) By the same token, denial of a claim on a basis unfounded in the facts known to the insurer, or contradicted by those facts, may be deemed unreasonable. "A trier of fact may find that an insurer acted unreasonably if the insurer ignores evidence available to it which supports the claim. The insurer may not just focus on those facts which justify denial of the claim." (*Mariscal v. Old Republic Life Ins. Co.* (1996) 42 Cal.App.4th 1617, 1623 [50 Cal. Rptr. 2d 224]; see also *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 880 [93 Cal. Rptr. 2d 364].)

Applying these principles to the facts in the summary judgment record, we agree with the Court of Appeal that plaintiff has demonstrated a triable issue of fact as to whether 21st Century's decision to deny her UIM claim in July 2001 was made unreasonably and in bad faith. [4] Wilson complained of neck pain after the accident and in subsequent weeks and months. On examination of the patient and her X-ray, Dr. Southern, an orthopedist, concluded a segment of her cervical spine was "obviously degenerative," [****13] that such a change was unusual at her age, and was probably due to her recent automobile accident. The MRI he ordered confirmed bulging disks in the vertebrae of her neck. Wilson was continuing to feel neck pain in June 2001 when, through her attorney, she made the UIM claim.

Despite his receipt of this information, 21st Century's claims examiner asserted in his internal denial memo that it was "unlikely" the disk bulges were caused by the accident and that because Wilson was "on vacation" in Australia her claims of severe pain should be "discount[ed]." Having received approval to deny the claim, he then did so on the ground that Wilson's pain was due only to "soft tissue injury superimposed by a preexisting degenerative disc disease."

---

[4] The parties agree Wilson's bad faith claim is based on 21st Century's actions leading to the July 2001 denial. Wilson abjures reliance on any conduct after that point, while 21st Century argues only that evidence of its subsequent actions was relevant to show its good faith willingness to reconsider the denial.

42 Cal. 4th 713, *721; 171 P.3d 1082, **1087; 68 Cal. Rptr. 3d 746, ***752; 2007 Cal. LEXIS 13314, ****13

**(3)** Unfortunately for 21st Century's summary judgment position, a jury could reasonably find that nothing in the material the claims examiner had [****14] received justified these conclusions. 21st Century directs us to no medical report or opinion on the basis of which the claims examiner could reasonably have ignored or disbelieved Dr. Southern's conclusion that the changes in Wilson's cervical spine were probably caused by her recent trauma; as far as the record reveals, the claims examiner had no basis for his contrary [*722] conclusion that such a causative link was "unlikely." Nor is there any apparent medical basis for the claims examiner's assertion that Wilson had "preexisting degenerative disc disease." No such diagnosis appears in the medical reports submitted to 21st Century, and we are directed to no evidence that the company's claims examiner had sufficient medical expertise to make such a diagnosis himself. [5] As to the fact that [***753] Wilson was [**1088] studying in Australia (not on vacation, as the claims examiner baselessly asserted) in 2001, the Court of Appeal aptly observed that "it is as possible to suffer 'severe pain' in Australia as in Southern California."

21st Century, of course, was not obliged to accept Dr. Southern's opinion without scrutiny or investigation. To the extent it had good faith doubts, the insurer would have been within its rights to investigate the basis for Wilson's claim by asking Dr. Southern to reexamine or further explain his findings, having a physician review all the submitted medical records and offer an opinion, or, if necessary, having its insured examined by other physicians (as it later did). What it could not do, consistent with the implied covenant of good faith and fair dealing, was *ignore* Dr. Southern's conclusions without any attempt at adequate investigation, and reach contrary conclusions lacking any discernable medical [****16] foundation. (*Egan v. Mutual of Omaha Ins. Co.*, *supra*, 24 Cal.3d at p. 819; *Mariscal v. Old Republic Life Ins. Co.*, *supra*, 42 Cal.App.4th at p. 1623.) A jury could reasonably find 21st Century did so here. [6]

───────────────────────

[5] At oral argument, counsel for 21st Century opined that the claims examiner's assertion of preexisting degenerative disk disease was based on the MRI report's observation of "mild [****15] dextroscoliosis." But even assuming Wilson's mild scoliosis preexisted the accident, which the medical reports do not assert, there is nothing in the reports to suggest it contributed to her neck pain. Nor is any medical basis apparent for the claims examiner's equation of scoliosis with degenerative disk disease. Scoliosis can have many causes, including hip disease, asymmetric muscle spasms, rickets, and ophthalmological dysfunction. (Stedman's Medical Dict., *supra*, at p. 1606.)

[6] 21st Century observes that after its claims examiner told plaintiff's attorney, Hall, of his opinion that the submitted medical reports did not support the claim of cervical disk injury from the accident, Hall did not argue the point further or immediately send additional medical information. 21st Century maintains this relieved it of any duty to further assess or evaluate the claim, at least until it received more information. But Hall had *already* drawn the claims examiner's attention to Dr. Southern's report and

On the subject of further investigation, 21st Century criticizes the Court of Appeal's statement that "when proper adjustment of a claim turns on a medical evaluation of the insured's condition an insurer breaches its duty to thoroughly investigate the claim if it fails to have the [****17] insured examined by a doctor of its choice or at least to consult with the insured's treating physician." The appellate court, 21st Century argues, incorrectly held that the [*723] failure to order an examination is bad faith in all cases, while regulations of the Insurance Commissioner indicate an insurer should ask for an independent examination only when it believes it reasonably necessary. (See Cal. Code Regs., tit. 10, § 2695.7, subd. (n).) We agree that, the critical issue being the reasonableness of the insurer's conduct under the facts of the particular case, stating a general rule as to how much or what type of investigation is needed to meet the insurer's obligations under the implied covenant is difficult. An insurer's good or bad faith must be evaluated in light of the totality of the circumstances surrounding its actions. (*Nager v. Allstate Ins. Co.* (2000) 83 Cal.App.4th 284, 288 [99 Cal. Rptr. 2d 348]; *Walbrook Ins. Co. v. Liberty Mutual Ins. Co.* (1992) 5 Cal.App.4th 1445, 1455–1456 [7 Cal. Rptr. 2d 513].) In some cases, review of the insured's submitted medical records might reveal an indisputably reasonable basis to deny the claim without further investigation. But as the Court of Appeal explained [***754] in passages following [****18] the statement 21st Century criticizes, and as we demonstrate above, under the facts of this case a triable issue of fact exists as to whether it was reasonable to deny Wilson's claim on the grounds stated without further medical investigation.

II. *The Genuine Dispute Rule*

**(4)** As discussed earlier, an insurer's denial of or delay in paying benefits gives rise to tort damages only if the insured shows the denial or delay was unreasonable. (*Frommoethelydo v. Fire Ins. Exchange*, *supra*, 42 Cal.3d at pp. 214–215.) As a close corollary of that principle, it has been said that "an insurer denying [**1089] or delaying the payment of policy benefits due to the existence a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract." (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 347 [108 Cal. Rptr. 2d 776].) This "genuine dispute" or

---

opinion. A jury could find that the insurer's willingness to receive additional information did not conclusively demonstrate its good faith in disregarding the information already provided.

"genuine issue" rule was originally invoked in cases involving disputes over policy interpretation, but in recent years courts have applied it to factual disputes as well. (See *id.* at p. 348; *Fraley v. Allstate Ins. Co.* (2000) 81 Cal.App.4th 1282, 1292–1293 [97 Cal. Rptr. 2d 386]; [****19] *Guebara v. Allstate Ins. Co.* (9th Cir. 2001) 237 F.3d 987, 992–994.)

The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim. A *genuine* dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.*, *supra*, 90 Cal.App.4th at pp. 348–349; [*724] *Guebara v. Allstate Ins. Co.*, *supra*, 237 F.3d at p. 996.) [7] Nor does the rule alter the standards for deciding and reviewing motions for summary judgment. "The genuine issue rule in the context of bad faith claims allows a [trial] court to grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable—for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law. [Citation.] … On the other hand, an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably." (*Amadeo v. Principal Mut. Life Ins. Co.* (9th Cir. 2002) 290 F.3d 1152, 1161–1162.) [****20] Thus, an insurer is entitled to summary judgment based on a genuine dispute over coverage or the value of the insured's claim only where the summary judgment record demonstrates the absence of triable issues (Code Civ. Proc., § 437c, subd. (c)) as to whether the disputed position upon which the insurer denied [***755] the claim was reached reasonably and in good faith.

Contending its denial of Wilson's claim rested on a genuine dispute as to the true value of the claim, 21st Century posits three grounds for factual dispute. First, 21st Century notes that the initial X-ray of Wilson's cervical spine, ordered by Dr. Jackson, was described by the radiologist as "normal" and as showing "no fracture, degenerative change or soft tissue swelling." Wilson, of

---

[7] In this connection, we find potentially misleading the statements in some decisions to the effect that under the genuine dispute rule bad faith cannot be established where the insurer's withholding of benefits "is reasonable *or* is based on a legitimate dispute as to the insurer's liability." (*Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 949 [43 Cal. Rptr. 3d 468], italics added; see also *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.*, *supra*, 90 Cal.App.4th at p. 346 [" 'if reasonable or if based on a legitimate dispute' "]; *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1281 [31 Cal. Rptr. 2d 433] [same].) In the insurance bad faith context, a dispute is not "legitimate" unless it is founded on a basis that is reasonable under all the [****21] circumstances.

course, never claimed she had suffered a spinal fracture. She relied, in her attorney's June 2001 demand letter, on Dr. Southern's diagnosis of degenerative disk changes resulting from the accident. 21st Century, in response, did not take the position that Wilson had no degenerative changes to her cervical disks. Rather, it denied the claim on the ground that the disk damage was "preexisting." As we have already explained, a jury could find that 21st Century lacked any factual basis for that conclusion and that in reaching it the company had unfairly ignored medical evidence submitted by its insured. [8] As a dispute based on such an unreasonable position is not genuine, summary judgment was not proper on this ground.

 [*725]

 [**1090] Second, 21st Century argues that the fact Wilson had only $4,275 in medical expenses when she made her claim, most of it for diagnosis rather than treatment, indicated to the company that Wilson was not seriously injured. At the time it denied Wilson's claim, however, 21st Century did not cite the relatively modest size of Wilson's medical bills as a ground for denial. In any event, the basis for Wilson's policy limits claim, as communicated in her attorney's demand letter, was not that the neck injury was so severe as to require expensive treatment in the short term, but rather that it was continuing to cause her significant pain and "at an incredibly young age, [Wilson] now faces degenerative disk changes" that could leave her in pain for the rest of her life. The relatively low medical bills incurred in the first few months after the accident would not have been a reasonable basis for disputing  [****23] the size of Wilson's future damages due to future pain and suffering even had 21st Century asserted such a position, which it did not. For these reasons, the size of the medical bills submitted did not entitle 21st Century to judgment as a matter of law; summary judgment was not proper on this ground.

Finally, 21st Century relies on Wilson's "extensive travels in 2001," to wit, her trip to Europe after the accident and her period of study in Australia later in 2001. The claims examiner cited the Australia trip, but not that to Europe, as grounds for denial in his internal memo and in his telephone conversation with Wilson's attorney. As already explained, however, a jury could find 21st Century had no basis for concluding that Wilson's period of studying and traveling in Australia contradicted her claim of continuing significant neck pain and could therefore find that

---

[8] Moreover, even had 21st Century asserted, in denying the claim, that  [****22] the initial X-ray demonstrated the absence of spinal injury, a jury could reasonably find such a conclusion to have been reached unreasonably and without due consideration of the competing evidence, to wit, the second set of X-rays, the MRI report and Dr. Southern's clinical evaluation.

42 Cal. 4th 713, *725; 171 P.3d 1082, **1090; 68 Cal. Rptr. 3d 746, ***755; 2007 Cal. LEXIS 13314, ****22

the examiner raised the Australia trip not in genuine dispute of her claim's value, but as a pretext or rationalization for denying it. [9] [***756]  Summary judgment was not proper on this ground either.

The dissenting opinion's argument for existence of a genuine dispute rests on an important misapprehension regarding the record. Plaintiff's June 2001 demand for the policy limits did not depend on anticipated future special damages for spinal surgery, as the dissent suggests by its emphasis on medical disagreement over whether surgery was recommended. (Dis. opn., *post*, at pp. 727–728.) Rather, plaintiff's demand rested largely on asserted *general damages* for the lifelong consequences of what Dr. Southern found to be probable degenerative disk changes. A jury could reasonably find that the [*726  lack of a clear spinal surgery recommendation as of July 2001 was not a reasonable basis for ignoring Dr. Southern's clinical evaluation.

III. *Other Issues*

Turning  [****25] from the question of a triable factual issue regarding its bad faith denial of the claim, 21st Century contends Insurance Code section 11580.26, subdivision (b) renders it immune from suit on this cause of action. That statute bars a cause of action for "exercising the right to request [UIM] arbitration," but has been held not to abrogate an insurer's duty to handle UIM claims in good faith. (See *Hightower v. Farmers Ins. Exchange* (1995) 38 Cal.App.4th 853, 861–863 [45 Cal. Rptr. 2d 348].) Because 21st Century did not timely raise this issue in the Court of Appeal, however, we decline to address it. (Cal. Rules of Court, rule 8.500(c)(1).) We also do not address issues briefed by Wilson that were not presented by the petition for review or answer. (Cal. Rules of Court, rule 8.520(b)(3).)

CONCLUSION

The summary judgment record demonstrates the existence of triable issues of fact as to whether, before rejecting Wilson's UIM claim in July 2001, 21st Century thoroughly [**1091]

---

[9] Dr. Southern's report noted that while traveling in Europe Wilson ?had significant problems carrying her backpack around and the  [****24] hand would go numb constantly." The insurer now argues that "[t]hose who have experienced serious neck injuries usually do not travel to Europe shortly thereafter, carrying their belongings in a way certain to cause substantial neck strain." But 21st Century directs us to no medical opinion in the summary judgment record to the effect that Wilson's continuing neck pain was caused by her use of a backpack rather than the automobile accident.

investigated and fairly evaluated the claim. Wilson presented sufficient evidence for a jury to find 21st Century's decision was " 'prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which [****26] unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement.? " (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.*, *supra*, 90 Cal.App.4th at p. 346.) 21st Century was therefore not entitled to judgment as a matter of law on Wilson's bad faith cause of action, and the trial court erred in granting summary judgment to the insurer.

## DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Moreno, J., and Kline, J.,[*] concurred.

**Dissent by:** Chin

## Dissent

**CHIN, J.,** Dissenting.—I cannot agree with the majority's conclusion that defendant 21st Century Insurance Company (21st Century) acted unreasonably [***757] and in bad faith when it delayed paying the policy limits on plaintiff's [*727] underinsured motorist claim. The radiologist who viewed a postaccident cervical spine X-ray in conjunction with plaintiff's own doctors, Community Hospital of Monterey Peninsula, and Pueblo Radiology concluded that [****27] plaintiff's cervical spine appeared "normal," with "[m]ild straightening of lordosis" but "no fracture, degenerative change or soft tissue swelling." Plaintiff then went on an extended backpacking trip to Europe *after* the accident. All of this, together with plaintiff's low initial medical bills, make 21 Century's initial actions in evaluating coverage very reasonable.

It was not until after plaintiff returned from Europe, and before a planned trip to Australia, that she first sought the medical opinion of Dr. Southern, an orthopedist, for the cause of her

---

[*] Presiding Justice of the Court of Appeal, First Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

42 Cal. 4th 713, *727; 171 P.3d 1082, **1091; 68 Cal. Rptr. 3d 746, ***757; 2007 Cal. LEXIS 13314, ****27

continuing neck pain. Dr. Southern told plaintiff that if the magnetic resonance imaging scan he ordered was "markedly abnormal" she should postpone her trip to Australia. But when the results arrived he did not advise her to alter her plans, and she traveled in Australia for 10 months.

In June 2001, while plaintiff was still in Australia, her attorney sent a demand letter to 21st Century for a policy limits payment. The insurer invited plaintiff's attorney to submit any additional medical records that might cause it to revise its claim value assessment, but the attorney said that he had nothing more to submit. After 21st Century offered [****28] plaintiff her medical payment reimbursement of $ 5,000 and denied the policy limits demand, plaintiff initiated statutory arbitration in July 2001, under Insurance Code section 11580.2.

Before the arbitration hearing, and after plaintiff returned from Australia in December 2001, she again saw Dr. Southern, who recommended a treatment regimen of physical therapy and antiinflammatory medications. He did not recommend surgery. It was not until plaintiff's June 2002 deposition in the arbitration proceeding, and for the first time in the two-year postaccident period, that plaintiff revealed that one of her doctors (Dr. Spencer) had recommended spinal fusion surgery. Following that recommendation, however, plaintiff sought another medical opinion from Dr. Szper (a neurosurgeon) who noted a "slight disc bulge" but found "nothing in my eyes which appears to be surgical." Dr. Szper recommended against surgery, and suggested plaintiff undergo pain management instead.

In light of plaintiff's arbitration testimony that revealed the conflicting expert views, 21st Century promptly and reasonably sought an independent medical opinion to corroborate plaintiff's medical expert's opinions. The [****29] insurer's medical experts, Drs. Nagelberg and Chafetz, initially opined that surgery was not advisable, agreeing with at least one of plaintiff's own medical experts. It was not until after Dr. Nagelberg was given a full [*728] diskogram report that he recommended surgical intervention in a supplemental [**1092] report to 21st Century. Thus, 21st Century *fulfilled* its statutory obligation to seek an independent medical opinion in light of Dr. Spencer's opinion that plaintiff might benefit from surgery. (Ins. Code, § 790.10; Cal. Code Regs., tit. 10, § 2695.7, subd. (n) [mandates that insurer requesting medical examination for purpose of determining liability shall do so only when insurer has good faith belief that examination is reasonably necessary].) 21st Century thereafter revised its assessment of the

claim's value and authorized payment to the insured of the $ 85,000 remainder of her underinsured motorist policy limit.

 [***758] I agree that we must evaluate the insurer's reasonableness under a "totality of the circumstances" standard. But contrary to the majority's view, the totality of the circumstances here shows that even plaintiff's experts had difficulty agreeing on the extent of her injury or the  [****30] proper course of treatment.

If an insurance company reasonably and legitimately disputes coverage, summary judgment for the insurer is proper in a bad faith action even if it is later determined that the insurer did owe policy benefits. (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 347–349 [108 Cal. Rptr. 2d 776] [tortious bad faith damages not imposed when insurer's initial failure to discharge contractual obligations was prompted by bad judgment or negligence]; see also Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2006) ¶ 12:837.1, pp. 12C-13.) In other words, a *mistaken* withholding of benefits or delay in payment is not bad faith where it is reasonable or based on a genuine dispute as to the insurer's liability. (See *Rappaport-Scott v. Interinsurance Exchange of the Automobile Club* (2007) 146 Cal.App.4th 831, 834–837 [53 Cal. Rptr. 3d 245] [applying genuine dispute doctrine to preclude bad faith in underinsured motorist action]; see also *Opsal v. United Services Auto. Assn.* (1991) 2 Cal.App.4th 1197, 1205 [10 Cal. Rptr. 2d 352] [before insurer can be found to have acted tortiously or in bad faith in refusing to bestow policy benefits, it must have done so " ' "without proper  [****31] cause" ' "].) Given the fact that plaintiff's own experts could not agree on the extent of her injuries, 21st Century reasonably disputed the extent and severity of plaintiff's injuries.

The majority's holding can only drive up the cost of underinsured motorist insurance—contrary to the clear public policy of keeping the costs of such insurance low. (See, e.g., *Yoshioka v. Superior Court* (1997) 58 Cal.App.4th 972, 984 [68 Cal. Rptr. 2d 553] [noting that uninsured (and hence, underinsured) motorist laws reflect the electorate's interest "in controlling the high costs of insurance"].) By allowing plaintiff to proceed with her lawsuit for bad faith even though a genuine dispute existed over the extent of her injuries [*729]  until 21st Century paid the policy limits, the majority encourages unwarranted and costly lawsuits, the unnecessary hiring of doctors and lawyers, and  the resulting increase in our automobile insurance premiums. 21st

42 Cal. 4th 713, *729; 171 P.3d 1082, **1092; 68 Cal. Rptr. 3d 746, ***758; 2007 Cal. LEXIS 13314, ****31

Century's reasonable and cautious behavior in light of the facts here should be encouraged on behalf of all consumers, not punished.

Accordingly, I dissent.

Baxter, J., concurred.

On December 19, 2007, the opinion was modified to read as printed above.

---

End of Document